UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

UNITED STATES OF AMERICA,

                                          No. 14-CR-314 (RA)

        vs.

RENE CARDONA,
                Defendant.

---------------------------------------------------------x

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO SUPPRESS

                                Daniel DeMaria, Esq. (DD4130)
                                Merchant Law Group LLP
                                203 East Post Road
                                White Plains, New York 10601

                                Carlos Moreno, Esq. (CM5375)
                                Carlos Moreno Law Office
                                352 7th Avenue, Suite 1204
                                New York, New York 10001

Preet Bharara, Esq.
United States Attorney (SDNY)
Andrew DeFilippis, Esq.
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York, 10007

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF PERTINENT FACTS.......................................................................2

ARGUMENT...............................................................................................................10

POINT I.    THE SEARCH WARRANT WAS NOT SUPPORTED BY PROBABLE CAUSE AND THE ITEMS SEIZED PURSUANT TO IT MUST BE SUPPRESSED........................................................................................10

    A.    APPLICABLE STANDARD..................................................................11

    B.    THE INFORMATION SET OUT IN THE SPIVACK AFFIDAVIT WAS WHOLLY INADEQUATE AND THUS DID NOT JUSTIFY THE ISSUANCE OF THE WARRANT..................................................13

    C.    THE GOOD FAITH EXCEPTION DOES NOT APPLY.......................18

POINT II.    THE WARRANT WAS IMPROPERLY EXECUTED AT NIGHT..................................................................................................22

POINT III.    THE DEFENDANT'S STATEMENTS MUST BE SUPPRESSED DUE TO THE ILLEGAL SEARCH AND SEIZURE......................................25

POINT IV.    THE DEFENDANT'S STATEMENTS MUST BE SUPPRESSED BECAUSE THEY WERE NOT MADE VOLUNTARILY...................26

    A.    APPLICABLE STANDARD..................................................................26

    B.    THE DEFENDANT'S STATEMENT WAS NOT VOLUNTARY..........................................................................................28

CONCLUSION............................................................................................................34

## TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

Berkemer v. McCarty, 468 U.S. 420 (1984).                                      28

California v. Beheler, 463 U.S. 1121 (1983).                                   28

Colorado v. Connelly, 479 U.S. 157 (1986).                                     27

Coolidge v. New Hampshire, 403 U.S. 443 (1971).                                23

Haynes v. State of Washington, 373 U.S. 503 (1963).                            27

Howes v. Fields, 132 S. Ct. 1181 (2012).                                       28

Illinois v. Gates, 462 U.S. 213 (1983).                                 11, 12, 18

Illinois v. Perkins, 496 U.S. 292 (1990).                                      28

Jones v. United States, 357 U.S. 493 (1958).                                   23

Katz v. United States, 389 U.S. 347 (1967).                                    11

Leyra v. Denno, 347 U.S. 556 (1954).                                           32

Lynumn v. Illinois, 372 U.S. 528 (1963).                                       27

Miranda v. Arizona, 384 U.S. 436 (1966) .                                      28

Monroe v. Pape, 365 U.S. 167 (1960).                                           23

Oregon v. Elstad, 470 U.S. 298 (1985).                                         33

Orozco v. Texas, 394 U.S. 324 (1969).                                          29

Parsad v. Greiner, 337 F.3d 175 (2d Cir. 2003).                                27

Payton v. New York, 445 U.S. 573 (1980).                                       11

People v. Acevedo, 579 NYS2d 156 (App. Div. 2d Dept. 1992).                    25

People v. Watson, 75 Cal App 3d 592 (CA App. Ct. 5th Dist. 1977).             24

Schneckloth v. Bustamonte, 412 U.S. 218 (1973).                                11

State v. Jordan, 742 N.W.2d 149 (Minn. 2007).                                  25

Tuttle v. Superior Court of San Luis Obispo County, 120 Cal App 3d 320 (CA App. Ct.  5th Dist. 1981).                           25

United States v. Ali, 68 F.3d 1468 (2d Cir. 1995).                           29

United States v. Anderson, 929 F.2d 96 (2d Cir. 1991).                           27, 32

United States v. Battershell, 457 F.3d 1048 (9th Cir. 2006)).                           15, 16, 21

United States v. Brunette, 256 F.3d 14 (1st Cir. 2001).                           14, 16, 17, 21

United States v. Christie, 570 F.Supp.2d 657 (D.N.J. 2008).                           15

United States v. Coffee, 434 F.3d 887 (6th Cir. 2006).                           12

United States v. Coreas, 419 F.3d 151 (2d Cir. 2005).                           1

United States v. Egipciaco, 389 F. Supp. 2d 520 (S.D.N.Y. 2005).                           27

United States v. Eng, 971 F.2d 854 (2d Cir. 1992).                           26

United States v. Falso, 544 F.3d 110 (2d Cir. 2008).                           12, 18, 19

United States v. George, 975 F.2d 72 (2d Cir. 1992).                           19

United States v. Genin, 524 Fed. Appx. 737 (2d Cir. 2013).                           21

United States v. Gibbons, 607 F.2d 1320 (10th Cir. 1979).                           23

United States v. Gourde, 440 F.3d 1065 (9th Cir. 2006).                           12

United States v. Groezinger, 625 F. Supp. 2d 145 (S.D.N.Y. 2009).                           13, 16, 21

United States v. Harris, 403 U.S. 573 (1971).                           11

United States v. Jasorka, 153 F.3d 58 (2d Cir. 1998).                           13, 16, 20, 21

United States v. Jaswal, 47 F.3d 539 (2d Cir. 1995).                           27

United States v. Leon, 468 U.S. 897 (1984).                           18

United States v. Merritt, 293 F.2d 742 (3d Cir. 1961).                           23

United States v. Mitchell, 966 F.2d 92 (2d Cir. 1992).                           28

United States v. Patane, 542 U.S. 630 (2004).                           27

United States v. Pena, 961 F.2d 333 (2d Cir. 1992).                                  26

United States v. Perez, 247 F. Supp. 2d 459 (S.D.N.Y. 2003).                          12

United States v. Ponce, 947 F.2d 646 (2d Cir. 1991).                                 11

United States v. Ravich, 421 F.2d 1196 (2nd Cir. 1970).                              23

United States v. Santa, 180 F.3d 20 (2d Cir. 1999).                                  26

United States v. Smith, 340 F. Supp. 1023 (D. Conn. 1972).                         23, 24

United States v. Syphers, 426 F.3d 461 (1st Cir. 2005).                          15, 16, 21

United States v. Taylor, 745 F.3d 15, 25, 26 (2d Cir. 2014).                         32

United States v. Uribe-Velasco, 930 F.2d 1029 (2d Cir. 1991).                        29

United States v. U.S. Dist. Court for Eastern Dist. of Mich., 407                    11
U.S. 297 (1972).

United States v. Ventresca, 380 U.S. 102 (1965).                                     12

United States v. Zimmerman, 277 F.3d 426 (3d Cir. 2002).                             19

United States v. Zerbo, 1999 WL 804129 (S.D.N.Y. 1999).                              27

Wong Sun v. United States, 371 U.S. 471 (1963).                                      26

## STATUTES & RULES                                        PAGE(S)

18 U.S.C. § 2256(2)(A).                                                               13

18 U.S.C. § 2256(2)(E).                                                               20

18 U.S.C. § 2256(8).                                                                  13

18 U.S.C. § 3501(a).                                                                  27

Fed. R. Crim. P. Rule 12.                                                             1

Fed. R. Crim. P. Rule 41.                                                         22, 23, 24

Fed. R. Crim. P. Rule 41(a)(2)(B).                                                    22

Fed. R. Crim. P. Rule 41(e)(2)(A)(ii)                                                 22

"Child pornography is so repulsive a crime that those entrusted
to root it out may, in their zeal, be tempted to bend or even break the rules.
If they do so, however, they endanger the freedom of all of us."
U.S. v. Coreas, 419 F.3d 151 (2d Cir. 2005)

## **PRELIMINARY STATEMENT**

The Defendant Rene Cardona ("Mr. Cardona") respectfully submits this Memorandum of Law in support of his pretrial motions pursuant to the Fourth and Fifth Amendments, and Federal Rule of Criminal Procedure 12, to suppress physical evidence and statements. The Defendant asserts that the search warrant from United States Magistrate Michael H. Dollinger lacks probable cause, that agents improperly executed the warrant at night, and that the agents did not present the Defendant with a copy of the search warrant at the outset of the search. As such, all of the evidence seized should be suppressed because it was obtained in violation of the Fourth Amendment. The Defendant further asserts that the statements he allegedly made to agents on the same day were fruits of the poisonous tree and taken in violation of his Fifth Amendment rights, and they too should be suppressed.

In support of his motion, Mr. Cardona relies on the following:

1) The Declaration of Daniel DeMaria, sworn September 8th, 2014 ("DeMaria Declaration"), and the exhibits attached thereto;[1]

---

[1]All exhibit references herein are to the DeMaria Declaration.

2) The Affidavit of Rene Cardona, sworn August 27th, 2014, and the exhibit attached thereto (**Ex. "F"**);

3) The Affidavit of Evelyn Cardona, sworn August 27th, 2014 (**Ex. G"**);

4) The Affidavit of Alfredo Aquino, sworn August 21st, 2014 (**Ex. H**);

5) The Affidavit of Norberto Troncoso, sworn August 22nd, 2014 (**Ex. I**); and

6) The Declaration of Xiomara Almonte, sworn August 28th, 2014 (**Ex. J"**).

## STATEMENT OF PERTINENT FACTS

On April 29th, 2014, FBI Special Agent Aaron E. Spivack ("Agent Spivack") filed an Application for a Search Warrant ("Warrant Application"), which consists of a one page form followed by Agent Spivack's affidavit, dated  April 29th, 2014 ("Spivack Affidavit"). (**Ex. A**).

According to the Spivack Affidavit, Agent Spivack has been employed with the FBI since 2008, he is currently assigned to the Crimes Against Children Squad, and he is applying for a search warrant to search the premises located at ▮ Sherman Avenue, ▮▮▮▮▮ New York, New York 10040. Id. ¶1, 4 Agent Spivack deposes that he is "familiar with the child pornography laws and how child pornography violations are commonly committed".

Id. ¶1 He does not state whether he has taken any classes relating to child pornography or the sexual exploitation of children, whether he has ever participated in any investigations into the receipt, possession, distribution, and/or production of child pornography, whether he has ever been involved in the investigation of child pornography cases, whether he has ever reviewed photographs which constitute child pornography, whether he is familiar with methods of determining whether a child is a minor, or whether he has any knowledge, familiarity, or training relating to the use of computers by sex offenders.

Agent Spivack deposes that "there is probable cause to believe that the SUBJCET [SIC] PREMISES presently contains evidence, fruits or instrumentalities of the possession, transportation, receipt, distribution, or reproduction of child pornography..." Id. ¶24. The probable cause section of the Spivack Affidavit is short. It does not include any photographs, or any exhibits other than "Attachment A", which is simply boilerplate.  The probable cause section pertaining to the alleged offense is reproduced below, with the exception of the messages between "REYCCRUZ" and the alleged victim which are found at paragraphs 7 to 13 of the Spivack Affidavit:

> 7.    Based on information obtained from an FBI agent based in Guam, I have learned the following:
>
>> a.    On March 13, 2014, the Guam Police Department received information that an 11-year-old boy (the "Victim") produced child pornography for an adult male in New York. The VICTIM met the adult male over the social media site Instagram in approximately February, 2014. The adult male went by the username "REYCCRUZ" on Instagram.

   b.  The Guam Police Department referred the case to the FBI. With the VICTIM's consent, FBI agents in Guam searched the VICTIM's phone, with which the VICTIM had communicated with "REYCCRUZ" on Instagram. The search confirmed the information reported by the Guam Police Department.

   c.  FBI agents in Guam subsequently obtained a search warrant directed to Instagram for the contents of the "REYCCRUZ" account.

8.  I have reviewed the contents of the account produced in response to the warrant. The contents reflect that "REYCCRUZ" and the VICTIM developed an online relationship and had sexually explicit discussions. Over the course of a few days, "REYCCRUZ" and the VICTIM traded photographs and "REYCCRUZ" asked the VICTIM to provide sexually explicit photographs of himself. The VICTIM provided "REYCCRUZ" with approximately five sexually explicit photographs of himself (constituting production and receipt of child pornography). "REYCCRUZ" provided the VICTIM with approximately nine sexually explicit photographs of himself.

9.  The following is an excerpt of the communications between the VICTIM and "REYCCRUZ" where the age of the VICTIM is discussed: [messages omitted]

10.  The following are excerpts of some of the sexually explicit communications between the VICTIM and "REYCCRUZ": [messages omitted]

11.  The following is an excerpt of the communications between the VICTIM and "REYCCRUZ" in which "REYCCRUZ" asked the VITCIM [sic] to show "REYCCRUZ" his genitals: [messages omitted]

12.  The following is an additional excerpt where "REYCCRUZ" engaged the VICTIM in sexually explicit conversations. "REYCCRUZ" asked to see nude photographs of the VICTIM and offered to show the VICTIM his genitals: [messages omitted]

-4-

13.     The following is another excerpt of the conversation between "REYCCRUZ" and the VICTIM where "REYCCRUZ" asked the VICTIM for additional photographs: [messages omitted]

14.     The following is an additional excerpt where the VICTIM and "REYCCRUZ" again discussed their respective ages: [messages omitted]

Id. ¶ 7-14

While the omitted messages show someone using an account with the screen name "REYCCRUZ" asking for pictures, none of the messages suggest that the alleged victim ever actually took any pictures, that the alleged victim ever sent pictures to "REYCCRUZ", or that "REYCCRUZ" ever sent or received any pictures. For example, at one point "REYCCRUZ" stated, "Send it to me whenever you're ready and I'll send mine back". Id. ¶11 There is no indication that the alleged victim ever sent  any picture in response. Similarly, "REYCCRUZ" stated: "Send me a picture. And then I will erase it. As soon as I see it." Id. ¶11 Here too, there is nothing at all to suggest that the alleged victim ever took a picture in response or that he sent any picture to "REYCCRUZ".

On another occasion, "REYCCRUZ" states "Send me a vid", to which the alleged victim replies "I can't. My familey [sic] here". Id. ¶13 To which "REYCCRUZ" replied, "Another pic thwn" [sic]. The victim replies "OK wait". Id. ¶13 Here too, there is no evidence that the alleged victim ever took a sexually explicit picture, or that he even sent *any* picture to "REYCCRUZ". At no point does "REYCCRUZ" ever thank the alleged victim for sending pictures. At no point does "REYCCRUZ" ever compliment the alleged victim. While

-5-

the message "[a]nother pic thwn" appears to imply that a picture may have previously been sent to "REYCCRUZ", there is no proof that a picture was actually sent, or that any such picture was sexually explicit, or even a picture of the alleged victim.

Not only does Agent Spivack's affidavit fail to include any messages which state that the victim sent any photographs at all to "REYCCRUZ" let alone "approximately five sexually explicit photographs," the Spivack Affidavit also does not include any messages where either party acknowledges actually having sent, received, or taken, any picture. Moreover, the Spivack Affidavit does not include any pictures, or any descriptions of the pictures. It simply says: "The VICTIM provided "REYCCRUZ" with approximately five sexually explicit photographs of himself (constituting production and receipt of child pornography)". Id. ¶8 In fact, it does not appear that Agent Spivack himself has ever seen the pictures. He simply states "I have reviewed the contents of the [Instagram] account produced in response to the warrant [directed to Instagram]." Id. ¶8 There is no description of the contents allegedly produced by Instagram, nor does Agent Spivack depose that he has personally seen the photographs. Based on the vague and conclusory statements set out in the Spivack Affidavit, it appears that Instagram may only have produced messages (and not pictures) in response to the warrant. Id. ¶8

On April 29th, 2014, at approximately 9:00 p.m., United States Magistrate Michael H. Dollinger issued a search and seizure warrant ("Search Warrant") based on the information set out in the Spivack Affidavit. (**Ex. B**) The Search Warrant authorized the FBI to search

the apartment which Rene Cardona shares with his mother and which is located at █
Sherman Avenue, █████████ New York, New York 10040, ("Cardona Residence")
during the daytime hours of 6:00 a.m. and 10:00p.m. Id.

The next morning, sometime between 5:30 and 5:45 a.m., FBI agents pounded on the door to the Cardona Residence.[2] At that time, there were four occupants in the residence - Rene Cardona, (the defendant), Evelyn Cardona (his mother), and his friends Norberto Troncoso and Cristian (last name unknown) **(Ex. G ¶2)**.  All of the occupants were sleeping, other than Mrs. Cardona who was cooking in the kitchen. Id. ¶2 Mrs. Cardona opened the apartment door, in response to the pounding, and a number of FBI agents flooded the apartment. Id. ¶3 More than twenty minutes elapsed after FBI agents barged into the apartment before the occupants were shown a copy of the warrant. Id. ¶3  In fact, as soon as the agents entered the apartment, one of them shined a blindingly bright incapacitating flashlight into the Defendant's eyes. **(Ex. F ¶3)** The Defendant, who had barely slept the night before, became disoriented and nauseous. Id. He was immediately frisked and ushered into his mother's bedroom by Agent Spivack and Special Agent John D. Robertson ("Agent Robertson") one of whom had his hands on the Defendant's shoulders. **(DeMaria Decl. ¶4,**

---

[2] The Defendant has tendered affidavits from four witnesses in addition to his own. Mr. Cardona asserts the FBI arrived at 5:40 a.m. **(Ex. F ¶2)** His mother, Evelyn Cardona was the only witness who was awake, and her testimony should therefore be given greater weight than the others, deposes that the FBI arrived at 5:30 a.m. **(Ex. G ¶2)** According to Alfred Aquino, one of the neighbors, the FBI arrived at 5:45 a.m. **(Ex. H ¶2)** Norberto Tronscoso deposes that the FBI arrived at 5:42 a.m. **(Ex. I ¶3)** Xiomara Almonte, another neighbor, deposes the FBI arrived at 5:44 a.m. **(Ex. J ¶2)**

**Ex. F¶3)** The Defendant was made to sit in a chair while one of the agents sat directly in front of the Defendant, blocking his path to the door and making it impossible for the Defendant to stand up. Id. ¶4 The second agent sat one foot away from the Defendant. The door to the bedroom was closed. Id. While the Defendant was still disoriented, dizzy, and nauseous, the two agents proceeded to ask him a number of questions. Id. ¶5 The Defendant was advised that he had the right to receive water and medicine. Id. The Defendant was never advised that he had the right to remain silent, that he had the right to consult a lawyer, that he had the right to have a lawyer present during questioning, and that if he could not afford a lawyer that one could be appointed for him. Id. ¶7 The Defendant was told that he was not under arrest, likely so that the agents could get away with questioning him without reading him his rights and so they could get him to acknowledge in writing that he was not under arrest, even though he was effectively detained. The Defendant felt "trapped and unable to get out of the chair, much less the bedroom." Id. ¶5 The Defendant could not see his mother. His mother was not allowed to enter the bedroom to see him. He was not allowed to get his phone. Instead one of the agents left the room very briefly to retrieve the Defendant's phone. This was only done so the agents could examine the phone. The Defendant could not use it. Id. ¶5-6

During questioning, one of the agents told the Defendant that would be "fucking pissed" if he found out that the Defendant was lying, and that he would tell the Judge or the Prosecutor to show "no mercy". Id. ¶7 When one of the two agents left the room briefly, the

second agent stayed very close to him. Other than two very brief moments where one of the agents left the room, the door was closed the entire time.  The Defendant was never left alone. There was always an agent standing guard. Mr. Cardona was afraid and paralyzed with fear. One of the agent's told the Defendant "you're going to do some time" in response to the Defendant asking, "How much time am I facing?" Id. ¶8 The Defendant was asked "many more questions" after that and while still at the apartment. Id. ¶9

Around 8:00 a.m., some 2.5 hours after the interrogation began, the agents handcuffed Mr. Cardona and placed him in a vehicle. The Defendant was neither read his rights at the apartment, nor on the way downtown. **(Ex. F ¶9; Ex. G ¶5)** Upon arriving at FBI headquarters, Agent Spivack and Special Agent Lesley Adamczyk continued to ask the Defendant questions **(DeMaria Decl. ¶5, Ex. F ¶10)**. After answering those questions, the Defendant was fingerprinted, and photographed. It was only then, and after he had already been interrogated for several hours (both at the apartment and at FBI headquarters) that the Defendant was given a copy of the "Advice of Rights" form and that he was finally advised of his Miranda rights.  **(Ex. C, F ¶10)** Although the Form appears to be dated at 6:07 a.m., the Defendant deposes that he did not sign this form at 6:07 a.m.. He neither saw this form nor signed it until he had already been at FBI headquarters for quite some time, and only after the agents had asked him a lot more questions, fingerprinted him and took his mug shot. **(Ex. F ¶10)** Perplexingly the Form is signed by the Defendant twice, and the notation "Re read @ 10:08 - waived witness" also appears. **(Ex. C)** Prior to signing this form, the

Defendant did not know that he did not have to speak to the agents and that he had the right to consult a lawyer. He thought he had to cooperate. **(Ex. F ¶11)** The Defendant deposes that based on his understanding of what is contained in FBI Reports, that the agents "misunderstood, misheard or misconstrued much of what was said." Id. ¶11

Later that day, Mr. Cardona was presented in federal court on the basis of a criminal complaint which is on file with the Court. (ECF #1)

On May 16th, 2014, Mr. Cardona was indicted, and charged with two counts of production of child pornography, one count of receipt of child pornography, one count of distribution of child pornography, and one count of possession of child pornography. A copy of this indictment is on file with the Court. (ECF #7)

## ARGUMENT

## POINT I

### THE SEARCH WARRANT WAS NOT SUPPORTED BY PROBABLE CAUSE AND THE ITEMS SEIZED PURSUANT TO IT MUST BE SUPPRESSED

The Court issued a search warrant on April 29th, 2014, authorizing a search of the Defendant's apartment for child pornography. The next day, FBI agents executed that warrant and seized a number of items, including the alleged child pornography upon which this prosecution is based. However, because the warrant was not supported by probable cause, the warrant was invalid and the items seized pursuant to it must be suppressed.

**A.      Applicable Standard**

A valid search warrant under the Fourth Amendment must be supported by probable cause. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Physical entry by police into a person's home is the "chief evil against which the wording of the Fourth Amendment is directed." United States v. U.S. Dist. Court for Eastern Dist. of Mich., 407 U.S. 297, 313 (1972). Indeed, "respect for the sanctity of the home... has been embedded in our traditions since the origins of the Republic." Payton v. New York, 445 U.S. 573, 601 (1980).

The entry and search of a person's home without a warrant supported by probable cause is *per se* unreasonable, with only a few specifically established and well-delineated exceptions - none of which apply here. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); Katz v. United States, 389 U.S. 347, 357 (1967).  Search warrants must be supported by probable cause to satisfy the dictates of the Fourth Amendment. United States v. Harris, 403 U.S. 573, 577 (1971).

Probable cause to search a place exists only if the issuing judge finds a "fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Ponce, 947 F.2d 646, 650 (2d Cir. 1991) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317 (1983)).  To make a determination as to whether probable cause is

present, a magistrate judge has to examine the application for the warrant and make a common sense determination based on all of the circumstances. Gates, 462 U.S. at 238.  The Court to which an application for a warrant is presented must not "serve merely as a rubber stamp for the police." United States v. Ventresca, 380 U.S. 102, 109 (1965). Rather, the court has to be neutral and detached in its assessment of the application's sufficiency and has to require that probable cause to be shown to the court before the application can be granted. Id. 106.

In reviewing the magistrate's probable cause determination, this Court cannot consider material outside of the affidavit tendered in support of the warrant application. United States v. Perez, 247 F. Supp. 2d 459 (S.D.N.Y. 2003).  This Court's review must be limited to "the affidavit's four corners." United States v. Falso, 544 F.3d 110, 123 (2d Cir. 2008)  ("All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath". Id. 122 (quoting United States v. Gourde, 440 F.3d 1065, 1067 (9th Cir. 2006)). See also United States v. Coffee, 434 F.3d 887 (6th Cir. 2006) ("Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit").

As set forth below, the application in the present case lacked probable cause. Far too much of the information in support of the warrant was generic and not related specifically to the facts and the Defendant in this case. The specific information that was set forth was wholly inadequate, and thus did not justify the issuance of the warrant.

**B.    The Information set out in the Spivack Affidavit was wholly inadequate and thus did not justify the issuance of the warrant.**

This Court recently held that, in a case in which the determination of probable cause turns on whether particular images linked to a suspect's home or computer contain child pornography, the warrant application must either append the images that allegedly constitute child pornography or include a reasonably detailed description of the allegedly proscribed material. United States v. Groezinger, 625 F. Supp. 2d 145, 159 (S.D.N.Y. 2009). In Groezinger as in the instant case, the warrant application stated that certain images contained child pornography, without describing which category of child pornography the images fell into. Id. 150.  "Child pornography" is defined as "any visual depiction, including any . . . computer or computer-generated image or picture . . . of sexually explicit conduct," 18 U.S.C. § 2256(8). "Sexually explicit conduct" is defined as "actual or simulated (I) sexual intercourse . . .; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." Id. § 2256(2)(A).

The first four of the categories of sexually explicit conduct describe behavior that is "clearly defined and easily recognized."  Groezinger, 625 F. Supp. 2d at 154, 155(quoting United States v. Jasorka, 153 F.3d 58, 60 (2d Cir. 1998), and citing cases). The fifth category, however – "lascivious exhibition of the genitals or pubic area" – is inherently ambiguous. Id.

In <u>United States v. Brunette</u>, 256 F.3d 14, 18 (1st Cir. 2001), the Court recognized that: "T]he identification of images that are lascivious will almost always involve, to some degree, a subjective and conclusory determination on the part of the viewer. That inherent subjectivity is precisely why the determination should be made by a judge, not an agent."

The issue here is that the warrant application neither appends the images nor provides any description whatsoever of the images. It does not specify which of the five categories of "sexually explicit conduct" the images fall into. It merely states that "The VICTIM provided "REYCCRUZ" with approximately five sexually explicit photographs of himself (constituting production and receipt of child pornography)." **(Ex. A ¶8)** There was simply no way for the magistrate judge to make an independent legal determination that the images depicted either the conduct described in the first four categories of "sexually explicit conduct" or "lascivious exhibition of the genitals or pubic area". Without seeing the images himself, or at least reviewing a reasonably detailed description of the images, the magistrate judge was impermissibly being asked to rubber stamp the conclusions of Agent Spivack.

<u>United States v. Brunette</u>, 256 F.3d 14, 18 (1st Cir. 2001), a case decided by the First Circuit in 2001, is directly on point. In <u>Brunette</u>, a federal agent (like Agent Spivack) did not append any of the allegedly pornographic images to his warrant application affidavit, and did not provide any description of the photographs. Instead, "he merely asserted that they met the statutory definition of child pornography." Id. 15-17. The court noted that "if copies [of the photographs] cannot feasibly be obtained, a detailed description, including the focal point

and setting of the image, and pose and attire of the subject, will generally suffice." Id. 20. Because this was not done, the court held that probable cause was lacking, and rejected the lower court's reliance on the agent's training and experience in determining that the photographs contained child pornography.

United States v. Syphers, 426 F.3d 461 (1st Cir. 2005), cert. denied, 547 U.S. 1158 (2006), is also on point. In that case, the warrant application did not append images previously seized or describe the physiological features of the persons depicted in those images. The court declined to decide the probable cause issue – instead finding that the good faith exception to the exclusionary rule applied – but stated:

> The best practice is for an applicant seeking a warrant based on images of alleged child pornography to append the images or provide a sufficiently specific description of the images to enable the magistrate judge to determine independently whether they probably depict real children. An officer who fails to follow this approach without good reason faces a substantial risk that the application for a warrant will not establish probable cause.

Id. at 467.

In United States v. Battershell, 457 F.3d 1048, 1051 (9th Cir. 2006), the Ninth Circuit held that a conclusory statement that pictures depicted a young female naked in a bathtub was insufficient to establish lascivious exhibition of genitals or pubic area. In United States v. Christie, 570 F.Supp.2d 657, 688-89 (D.N.J. 2008), the district court held that a magistrate judge must review a "factual description of the images".

-15-

In United States v. Jasorka, 97-CR-300(CS) (7/17/97) (ECF #46), then-Chief Judge Sifton in the Eastern District of New York held in an apparently unreported decision that an affidavit submitted by a Federal Agent (like Agent Spivack) which stated that certain parcels contained "pornographic photographs of male children displaying a lewd and lascivious exhibition of the genitals and pubic areas" did not establish probable cause. The photographs had not been shown to the magistrate judge and the description of the photographs was not sufficiently detailed to permit a finding that they involved lascivious conduct. The Second Circuit did not reverse or even question the district court's no probable cause finding, but upheld the search based on the good faith exception to the exclusionary rule. United States v. Jasorka, 153 F.3d 58, 59-60 (2d Cir. 1998). In short, the district court's decision in Jasorka is still good law in the Second Circuit on the issue of probable cause. In fact, Jasorka was recently endorsed by the Court in United States v. Genin, 524 Fed. Appx. 737, 738 (2d Cir. 2013), in cases such as this one where "the warrant affidavits contain[ ] only a perfunctory statement that the materials at issue contained 'child pornography'".

Under the authority of Genin, Jasorka, and Groezinger, and in light of the persuasive reasoning of Brunette, Syphers, and Battershell, Agent Spivack's affidavit here clearly failed to establish probable cause because it neither appended the images claimed to contain child pornography nor provided any description (let alone a reasonably detailed description) of what was depicted in those images. Indeed, the warrant application here is actually worse in terms of probable cause than the warrant applications in Jasorka and Brunette. In those cases,

the affidavits at least focused on the fifth category of sexually explicit conduct – lascivious exhibition – but failed to establish probable cause because there was no description and no images attached for the magistrate judge to consider and make his or her own judgment. In the instant case, the affidavit does not focus on any particular category – it just labels the images "child pornography" in a conclusory sweep. The Spivack Affidavit did not describe the "focal point and setting of the image, and pose and attire" of the alleged victim. Brunette 256 F.3d at 20. Thus, the magistrate judge could not have even known which category was involved, much less why any of the images constituted child pornography (or, for that matter, who concluded it was child pornography or what were that person's qualifications).

There are additional reasons why this warrant application lacked probable cause. Agent Spivack does not say whether he personally reviewed the images, and the vague wording in his affidavit suggests that it was police officers or FBI agents in Guam who viewed the images, not Agent Spivack himself.

Moreover, the affidavit contains no information about Agent Spivack's credentials, qualifications, training or expertise or the credentials, qualifications, training or expertise of the police officers or FBI agents in Guam, with respect to the determination of what types of images or materials constitute child pornography. With respect to Agent Spivack's own qualifications, he simply states at paragraph one of his affidavit:

> I have been employed as a Special Agent with the Federal Bureau of Investigation since October 2008. I am currently assigned to the Crimes

-17-

Against Children squad. I am familiar with the child pornography laws and
how child pornography violations are commonly committed.

**(Ex. A ¶1)**

At no point does Agent Spivack state how long he has been assigned to the Crimes Against
Children squad, how many child pornography cases he has worked on, or what training he
has received with respect to child pornography. He does not state whether he has ever had
the opportunity to actually observe and review examples of child pornography.

It is bad enough that the affidavit contains the conclusory statement that the images
contain child pornography. What makes it worse is that the magistrate judge had no basis
whatsoever to conclude that whoever came to that conclusion was qualified to do so. It is
hard to imagine a warrant application with less probable cause than this one. As the Supreme
Court emphasized in Gates, 462 U.S. at 239, a warrant affidavit "must provide the magistrate
with a substantial basis for determining the existence of probable cause, and... wholly
conclusory statement[s] ... fail [ ] to meet this requirement."

## C.       THE GOOD FAITH EXCEPTION DOES NOT APPLY.

The Supreme Court has held that the exclusionary rule does not apply to evidence
seized "in objectively reasonable reliance on" a warrant it issued by a detached and neutral
magistrate judge, even if the warrant is determined to be invalid. United States v. Leon, 468
U.S. 897, 922 (1984); United States v. Falso, 544 F.3d 110 (2d Cir. 2008).

This "good faith" exception, however, does not apply in the following circumstances:

(1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient [such as by failing to particularize the place to be searched or the things to be seized] that reliance upon it is unreasonable.

Falso, 544 F.3d at 125. In those circumstances, it would not be objectively reasonable for the agents to rely upon the legal judgment of the issuing judge. The burden is on the government to show the objective reasonableness of the agents' reliance on the warrant's issuance. United States v. George, 975 F.2d 72, 77 (2d Cir. 1992). As noted in United States v. Zimmerman, 277 F.3d 426, 437 (3d Cir. 2002), "[t]he good faith exception to the exclusionary rule is not a magic lamp for police officers to rub whenever they find themselves in trouble."

As detailed in the foregoing section, the indicia of probable cause in the Warrant Application was so lacking that reliance upon it was completely unreasonable. Based on the information set out in the Spivack Affidavit, the issuing judge never viewed the alleged pornography or any description thereof. In fact, the alleged pornography only appears to have been viewed by police officers or FBI agents in Guam whose qualifications, experience, and even whose name are entirely absent from the Spivack Application. It is also unstated in the Warrant Application what pictures the officers or agents in Guam even viewed. All that is stated is that someone appears to have found child pornography in "approximately five pictures" but it is not stated which pictures or the basis was for that conclusion. **(Ex. A ¶8)**

-19-

Upon this showing, probable cause was woefully lacking. The magistrate judge could not possibly have made a detached and neutral assessment of probable cause when so little information was provided, and even less that the agent was personally familiar with. There was absolutely no effort to describe the pictures. The generalized allegations that permeate the Warrant Application simply do not provide probable cause for a specific search - which needs to be particularized. Here, it was not. Further, Agent Spivack both applied for and executed the warrant. Thus, he would have been well aware of the application's vague contents and its deficiencies. He would have known, or should have known, that the magistrate could not possibly have made a detached and neutral determination on the information provided, and he therefore could not have reasonably and in good faith relied upon the issuance of the warrant to justify this search.

Importantly, the Second Circuit's <u>Jasorka</u> decision was rendered in 1998, some 16 years prior to the warrant application in this case. In that case, the Second Circuit did not disturb the district court's decision that an agent's mere assertion that certain photos constituted "lascivious exhibition of the genitals" under 18 U.S.C. §2256(2)(E) was insufficient and that probable cause therefore was lacking. Instead of analyzing the probable cause issue, the Second Circuit proceeded to the good faith issue and upheld the denial of the motion to suppress on that ground. However, it did not overrule or invalidate the district court's decision on probable cause, or express any disagreement with that aspect of the decision. Nor has the Second Circuit done so in any case since 1998. No one researching case

law in the Second Circuit, in 2014, on the issue of probable cause could miss <u>Jasorka</u> or its obvious message: conclusory assertions alone by an agent as to child pornography, without any details and without copies of the images, do not establish probable cause and are not impermissible in the Second Circuit. A message which the Second Circuit recently emphasized in <u>Genin</u>. The law in the Second Circuit pre-<u>Jasorka</u> may have been unclear, but it is now crystal clear after <u>Jasorka</u>, <u>Genin</u>, and <u>Groezinger</u>.

Stated differently, <u>Jasorka</u> and <u>Genin</u> gave the agent in this case no reason to believe his probable cause showing was sufficient. In fact, quite to the contrary, it strongly suggested the showing was completely deficient. It may be that he was counting on the good-faith exception to bail him out, à la Jasorka. If so, it is a practice that is ethically reprehensible and deserving of condemnation. No law enforcement agent should be able to submit a deficient or even marginal showing of probable cause while counting on the good-faith exception, and then claim to be acting in good faith. Such conduct is not in good faith.

Following <u>Jasorka</u>, the law became clearer still with decisions from other circuits. Specifically, decisions in cases such as <u>United States v. Brunette</u>, 256 F.3d 14 (1st Cir. 2001), <u>United States v. Battershell</u>, 457 F.3d 1048 (9th Cir. 2006) and <u>United States v. Syphers</u>, 426 F.3d 461 (1st Cir. 2005), firmly establish the necessity in "lascivious exhibition" cases "to append the images or provide a sufficiently specific description of the images to enable the magistrate judge to determine independently" if child pornography is involved. Syphers, Id., 467. Both <u>Brunette</u> and <u>Syphers</u> contain explicit warning that agents

failing to follow this approach will face substantial risk that their applications will be found insufficient. Those decisions were rendered long before the Warrant Application in this case was made and the law has been well-established for well over a decade. It bears repeating that the Warrant Application in this case does not even state that the images constitute "lascivious exhibition", it simply states that the photographs were "child pornography". **(Ex. A ¶8)** Under no circumstances can this be acceptable in light of the foregoing precedents and the agents simply cannot be said to have been acting in good faith.

## POINT II
### THE WARRANT WAS IMPROPERLY EXECUTED AT NIGHT

Reflecting the centuries old aversion to nighttime searches, Federal Rule of Criminal Procedure Rule 41(e)(2)(A)(ii) directs that a search warrant must be executed in the daytime "unless the judge for good cause expressly authorizes execution at another time." Federal Rule of Criminal Procedure 41(a)(2)(B) defines "daytime" as "the hours from 6:00 A.M. to 10:00 P.M. according to local time." Thus, when determining whether a search is reasonable under the Fourth Amendment the trial court is required to consider whether the search occurred at night. In this case the search occurred sometime between 5:30 a.m. and 5:45 a.m. **(Ex. F to J)** Given that Mrs. Cardona was the only one awake (and presumably alert), her testimony that the agents executed the warrant at 5:30 a.m. should carry far greater weight than the testimony of the other witnesses. **(Ex. G ¶2)** In any event, whether the agents arrived at 5:30 a.m. or at 5:45 a.m. makes no difference as far as Rule 41 is concerned.

"At common law, prior to the adoption of the Bill of Rights there was a strong aversion to nighttime searches." United States v. Gibbons, 607 F.2d 1320, 1326 (10th Cir. 1979). This aversion was then, and is now, primarily focused on intrusions into the home. Id. "Searches of the dwelling house were the special object of this universal condemnation of official intrusion. Night-time search was the evil in its most obnoxious form." Id. (quoting Monroe v. Pape, 365 U.S. 167, 210 (1960)); Jones v. United States, 357 U.S. 493, 498 (1958) ("[I]t is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home[.]"); Coolidge v. New Hampshire, 403 U.S. 443, 477 (1971) (midnight entry into dwelling is an "extremely serious intrusion"); United States v. Ravich, 421 F.2d 1196, 1201 (2nd Cir. 1970) (noting "peculiar abrasiveness" of intrusions by law enforcement officials at night); United States v. Smith, 340 F. Supp. 1023, 1029 (D. Conn. 1972) ("The fourth amendment protects individual privacy, and intrusion into an occupied home in the middle of the night is plainly a greater invasion of privacy than entry during the day.").

A violation of Rule 41's prohibition against unauthorized nighttime searches requires suppression of the seized evidence. United States v. Merritt, 293 F.2d 742, 744 (3d Cir. 1961) (Fact that when search commenced defendant threw packages, subsequently found to contain heroin, out window in view and presence of government officers, did not render valid nighttime search and seizure, based on warrant authorizing daytime search, and evidence found by search was inadmissible).

-23-

Here, the affidavit in support of the search warrant contained no facts to support the issuance of a nighttime search warrant and there was simply no need for a nighttime search. Federal agents could have sought judicial authorization for a nighttime search but did not do so, instead deciding for themselves that it was appropriate to execute the search warrant around 5:30 a.m., half an hour before the start of daytime. This search violated Rule 41, and was unreasonable under the Fourth Amendment. No judge would have authorized a nighttime search in this case, because the facts did not support it. Yet such a search nonetheless occurred. Under these circumstances, the evidence obtained as a result of the search warrant obtained and executed on April 30th, 2014 must be suppressed.

There are few cases directly on point. In United States v. Smith, 340 F. Supp. 1023, 1029 (D. Conn. 1972) , the court held that entry of an occupied family home beginning at 4:15 a.m. under a daytime search warrant was constitutionally unreasonable and warranted suppression of the evidence.

In People v. Watson, 75 Cal App 3d 592 (CA App. Ct. 5th Dist. 1977), the court held that a residential search for marijuana conducted thirteen minutes after the 10:00 p.m. deadline imposed by state statute, failed to meet the implicit Fourth Amendment requirement that it state "particularly" a reason for a nighttime search, and the Defendant's suppression motion was granted.

In People v. Acevedo, 579 NYS2d 156 (App. Div. 2d Dept. 1992), the court held that entry at 4:30 a.m. into a residence to search for stolen electronic equipment under an improperly issued nighttime warrant, when there in fact had been no need to enter at night, had violated the defendant's constitutional rights and the evidence was suppressed.

In Tuttle v. Superior Court of San Luis Obispo County, 120 Cal App 3d 320 (CA App. Ct. 5th Dist. 1981), the court granted a motion to suppress the hundreds of marijuana plants and 48 pounds of dried marijuana that had been seized on the grounds that a daytime search warrant was impermissibly executed at 5 a.m..

In State v. Jordan, 742 N.W.2d 149 (Minn. 2007), the court held that entry of the defendant's occupied home at approximately 6:00 a.m. one hour prior to the permitted time, to execute a search warrant required suppression of drug evidence obtained during search.

Here too, the evidence should be suppressed on the grounds that agents improperly executed the search warrant between fifteen and thirty minutes prior to the authorization contained therein.

## POINT III

## THE DEFENDANT'S STATEMENTS MUST BE SUPPRESSED DUE TO THE ILLEGAL SEARCH AND SEIZURE

Where there has been an illegal search and seizure, the exclusionary rule bars the introduction of statements derived or resulting therefrom. Here, the statements purportedly

made by the Defendant derived from the illegal search described in the foregoing point and hence were "fruit of the poisonous tree." The Defendant was placed in his mother's bedroom to be interrogated contemporaneously with the illegal search which was based on a warrant which was obtained without probable cause. The Defendant clearly knew that his home was being searched at the time he purportedly made the statements. **(Ex. F ¶3)** Since those statements were not and would not have been made in the absence of the illegal search, but instead were derived from a search that was being conducted at the very time the statements were made, they must be suppressed. See <u>Wong Sun v. United States</u>, 371 U.S. 471, 484 (1963); <u>United States v. Pena</u>, 961 F.2d 333, 338 (2d Cir. 1992); <u>United States v. Santa</u>, 180 F.3d 20, 25 (2d Cir. 1999); <u>United States v. Eng</u>, 971 F.2d 854, 859 (2d Cir. 1992).

<u>**POINT IV**</u>

**THE DEFENDANT'S STATEMENTS IN THIS CASE MUST BE SUPPRESSED BECAUSE THEY WERE NOT MADE VOLUNTARILY**

The Court should also suppress any and all statements purportedly made by Mr. Cardona because the government cannot prove that Mr. Cardona knowingly and voluntarily waived his right to remain silent.

**A.      Applicable Standard**

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." It thus bars the use of any statements at trial that were

made by a criminal defendant involuntarily. United States v. Patane, 542 U.S. 630, 640 (2004). A statement is "involuntary" if it was obtained by any type of physical or psychological coercion, or by some improper inducement that resulted in a defendant's will being overborne. Haynes v. State of Washington, 373 U.S. 503, 513-14 (1963); Lynumn v. Illinois, 372 U.S. 528, 534 (1963).

The government has the burden of establishing that any statements made in custody are voluntary, and that the individual knowingly and willingly waived his Miranda rights. See 18 U.S.C. § 3501(a) (requiring that the government establish the voluntariness of any confession before it is admitted against the defendant in a criminal trial.) See also, Colorado v. Connelly, 479 U.S. 157, 164, 168-69 (1986); United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). To determine voluntariness, courts consider the "totality of all the surrounding circumstances, including the [defendant's] characteristics, the conditions of interrogation, and the conduct of law enforcement." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991); Parsad v. Greiner, 337 F.3d 175, 183 (2d Cir. 2003). As with consent, relevant characteristics include  a defendant's age, his mental capabilities, his familiarity with the criminal justice system, and any coercive or threatening actions by law enforcement. United States v. Egipciaco, 389 F. Supp. 2d 520, 524 (S.D.N.Y. 2005); United States v. Zerbo, 1999 WL 804129 at *8 (S.D.N.Y. 1999).

**B.    The Defendant's Statement was not Voluntary**

Miranda v. Arizona, 384 U.S. 436 (1966) requires the police to inform a defendant, prior to questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. 478-79. Miranda rights are triggered when a defendant is subjected to "custodial interrogation." Illinois v. Perkins, 496 U.S. 292, 296 (1990). The warnings are not required where "[t]he essential ingredients of a 'police dominated atmosphere' and compulsion are not present." Id. 296.

In determining whether a defendant is in custody for Miranda purposes, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983). At issue is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes v. Fields, 132 S. Ct. 1181, 1189-90 (2012). The "inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992). The test is an objective one, based upon the perspective of a reasonable person in the suspect's position. Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

-28-

In <u>United States v. Ali</u>, 68 F.3d 1468, 1473 (2d Cir. 1995), on reh'g, 86 F.3d 275 (2d Cir. 1996), the Court held that an airline passenger was in custody where he was asked to step away from the boarding area, his travel documents were removed, and he was surrounded by officers. Similarly, in <u>United States v. Uribe-Velasco</u>, 930 F.2d 1029, 1033 (2d Cir. 1991) the Court held a defendant was in custody when an officer approached him from behind, told the defendant not to move and kept his hand on the defendant's back during questioning, and other officers surrounded the defendant. In <u>Orozco v. Texas</u>, 394 U.S. 324, 327 (1969), the Supreme Court held that a defendant was in custody when confronted in his bedroom by four officers at 4 a.m.

In the instant case, there can be no doubt that the Defendant was under arrest from the moment he was placed in his mother's bedroom after agents swarmed the apartment, and one them shined an incapacitating flashlight directly into the Defendant's eyes. **(Ex. F ¶3)** The Defendant was immediately searched and ushered into a bedroom by the shoulders, where he was made to sit in a chair. Id. ¶3 One of the agents sat directly in front of the Defendant, blocking the Defendant's path to the door and making it impossible for the Defendant to stand up. The second agent also sat very close to the Defendant. Id. ¶4 The Defendant felt trapped. The door to the bedroom was closed. Id. ¶4

While the Defendant was still disoriented, dizzy, and nauseous from the incapacitating flashlight, and from the fact he had barely slept the night before, as well as a medical condition, the agents proceeded to ask him a number of questions. Id. ¶5 The Defendant was

told he was not under arrest, though he "felt trapped and unable to get out of the chair, much less the bedroom." Id. ¶4 He was not allowed to see his mother, nor was he allowed to go and retrieve his phone. Id. ¶46 His mother was not allowed to enter the bedroom. **(Ex. F ¶5, Ex. G ¶2)**   At no time was the Defendant ever told that he had any rights with respect to answering the questions being put to him, other than the fact that he had to right to have water and medicine brought to him. **(Ex. F ¶7)** One of the agents told the Defendant that he would be "fucking pissed" if he found out the Defendant was lying to him, and that he would tell the Judge or the Prosecutor to show "no mercy", thus implying that the Defendant was in fact under arrest. Id. ¶7 During the same interrogation,  the Defendant asked one of the agents "How much time am I facing?", to which the agent replied "You're going to do some time." Id. 8. Some 2.5 hours after the interrogation began, the Defendant was handcuffed and removed from the apartment. Id. ¶9. Even then, the Defendant was not made aware of his Miranda rights. **(Ex. F ¶9, Ex. I. ¶5)**

After arriving at FBI headquarters, and still prior to having been advised of his Miranda rights,  two agents asked the Defendant more questions. **(Ex. F ¶ 10)** It was only after the Defendant answered those questions, and after he was fingerprinted, photographed, and taken into another room, that the Defendant was finally presented with the waiver of rights form which he signed. Id. ¶ 10. The Defendant deposes that he did not sign this form at the apartment, that he never saw this form at the apartment, and that he most definitely did

not sign this form at 6:07 a.m. Id. ¶10. The Defendant's contention that he never signed the form until long after questioning began (and until after he was fingerprinted at FBI headquarters), is supported by the fact that he was made to sign the same form two different times, while also purportedly refusing to sign at 10:08 a.m. **(Ex. C)** Will the government really expect the Court to believe that Mr. Cardona signed the form once, then refused to sign the same form when asked to sign it again, and then later changing his mind and signing it for a second time?

Reasonable surmise (based on Mr. Cardona's vehement assertion that he never signed the form at the apartment, and that he did not sign it until he had been at FBI headquarters for quite some time) is that at some point in time after he was fingerprinted, the agents asked him to sign the form while the "Place" and "Time" fields were blank. The Defendant signed, without expecting that the wrong times and locations would be inserted after the fact. Then, in order to be in a position to dispel the Defendant's expected assertion on a suppression motion (such as this one) that he never signed the form while at the apartment (and he most certainly did not), the  agents asked him to sign it a second time, at approximately 10:08 a.m - more than 4.5 hours after agents first began interrogating him. How else can the government possibly explain why the same form was signed twice? Surely the  agents would have been able to print or obtain a second form given that according to their version of events, Mr. Cardona signed the form for a second time while at their headquarters.

The Defendant's theory is supported by the fact that according to the FBI Report, Special Agents Spivack and Robertson witnessed Mr. Cardona sign the form at the apartment. Yet, Agent Robertson's signature does not appear on the form. It is clear that Agent Robertson signed the first page of the instant messaging transcripts **(Ex. D)**, and the Consent to Assume Online Presence **(Ex. E)**. The signatures on these two forms look very similar, if not identical. In contrast, the signature of the first witness on the "Advice of Rights" form **(Ex. C)** is completely different and does not even remotely appear to belong to Agent Robertson's signature. Nor does the second one, though the Defendant concedes that the second one was in fact signed by Agent Spivack. The fact that Agent Robertson is not one of the witnesses supports the Defendant's contention that he was not advised of his Miranda rights while at the apartment. **(DeMaria Decl. ¶8)** Simply stated, the Defendant's alleged confessions were not voluntary as there was a "restraint on [his] freedom of movement of the degree associated with a formal arrest" and he was not advised of his rights until at least 10:08 a.m., some four and a half hours after the agents began to interrogate him. To the extent that the Defendant made any statements following the time when he *actually* signed the waiver of rights form, such confession was tainted and should be suppressed. United States v. Taylor, 745 F.3d 15, 25, 26 (2d Cir. 2014) (taint of defendant's initial coerced confession "carried over" to his second statement the following day); United States v. Anderson, 929 F.2d 96 (2d Cir. 1991) ("coercive and improper tactics" that led to a finding that first confession was involuntary tainted the second confession as well); Leyra v. Denno,

-32-

347 U.S. 556 (1954) (subsequent confessions that followed initial involuntary confession were also involuntary where they were all "parts of one continuous process").

Factors that are relevant to determining whether the taint of a coerced confession has been dissipated include "the time that passes between confessions, the change in place of interrogations, and the change in identity of interrogators." Oregon v. Elstad, 470 U.S. 298, 310 (1985).Here, there was no change. Here, Agent Spivack was present during the interrogation both at the apartment as well as at FBI headquarters, and very little time elapsed between the time Mr. Cardona was taken from the apartment at approximately 8:00 a.m. and the time he was interrogated at FBI headquarters upon after arriving there.

## CONCLUSION

For the foregoing reasons, the Court is asked to grant the pretrial motions of Rene Cardona and to afford him such further relief as the Court deems just and proper.

Dated:        White Plains, New York
              September 8th, 2014          _____/S_____

                                          Daniel DeMaria, Esq. (DD4130)
                                          Merchant Law Group LLP
                                          203 East Post Road
                                          White Plains, New York 10601
                                          Tel: 845-704-7777
                                          Fax: 877-607-5419
                                          ddemaria@nyslitigators.com

-33-

Carlos Moreno, Esq. (CM5375)
Carlos Moreno Law Office
352 7th Avenue, Suite 1204
New York, New York 10001
Tel: 212-631-7555
mrncrls@aol.com