UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 02/24/2015

UNITED STATES OF AMERICA,

        -against-

RENE CARDONA,
    a/k/a "Rey Cardona Cruz"
    a/k/a "REYCCRUZ"

                Defendant.

No. 14-CR-314 (RA)

<u>OPINION</u>

RONNIE ABRAMS, United States District Judge:

On May 16, 2014, a grand jury indicted Defendant on two counts of production of child pornography under 18 U.S.C. § 2251(a), one count of each of distribution and receipt of child pornography under 18 U.S.C. § 2252A(a)(2)(A)–(B), and one count of possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B), (b)(2). This five-count indictment followed a search executed at Defendant's home on April 30, 2014. He now moves to suppress items seized during that search on the basis that the warrant authorizing the search was not supported by probable cause and could not be relied upon in good faith and, further, that the warrant was improperly executed at night. (<u>See</u> Dkt. 27.)[1] As the Court stated in its Order of February 17, 2015 (Dkt. 48), these aspects of his motion were DENIED with reasons to follow. These are those reasons.

## I.  BACKGROUND

On March 13, 2014, the Guam Police Department received information that an 11-year-old boy located in Guam ("Victim-1") had sent child pornography to an adult male in New York.

---

[1] Defendant also seeks to suppress statements he made to the FBI both on the basis that they were derived from an allegedly illegal search and on the basis that they were not made voluntarily. This opinion also resolves the first of those two arguments. The latter claim will be addressed in the course of a suppression hearing scheduled for February 25–26, 2015.

(Compl. (Dkt. 1) ¶ 2.)  After interviewing Victim-1, the FBI learned that he made contact with the adult male, whom the Government would later identify as Defendant, over Instagram, a popular mobile social media platform with photo sharing and chat capabilities.  (Gov't Mem. (Dkt. 30), Ex. A ¶ 7.)  The adult male communicated with Victim-1 under the username "REYCCRUZ." (Id.)  A search by FBI agents in Guam of Victim-1's phone confirmed that Victim-1 had, in fact, sent REYCCRUZ images the agents believed constituted child pornography.  (Compl. ¶ 2.)

On March 20, 2014, the FBI applied for and obtained a warrant in the United States District Court for the District of Guam "for information associated with the Instagram profile[s]" belonging to Victim-1 and REYCCRUZ (the "First Guam Warrant").  (See Gov't Mem., Ex. A at 1–2.) The affidavit of Special Agent Jason Dodd supporting the First Guam Warrant stated that the FBI's investigation at the time—including the consensual search of Victim-1's phone—had revealed that REYCCRUZ engaged in sexually explicit conversations with Victim-1 and solicited and exchanged sexually explicit images and videos with Victim-1.  (Gov't Mem., Ex. A ¶¶ 7–9 ("The adult sent the minor nude pictures of himself and a video of him (adult) masturbating. … The minor … also sent a picture of his genitals to the adult.").)  Agent Dodd's affidavit also contained excerpts of the lengthy and sexually explicit conversation between Victim-1 and REYCCRUZ. (See Gov't Mem., Ex. A ¶¶ 8–9.)

Following the execution of the first warrant, on April 17, 2014, the FBI sought a second warrant from the United States District Court for the District of Guam that ordered production of "audio, video, and movie" files, which had not been included in Instagram's response to the first warrant (the "Second Guam Warrant").  (See Gov't Mem., Ex. B.)  Agent Dodd's affidavit supporting the second warrant was substantially similar to his first, but also noted that, in February 2014, REYCCRUZ sent nine pictures to Victim-1 of his "erect genitalia, with one of those where

he appears to be having an orgasm" and that Victim-1 had sent "five pictures of his erect genitalia" to REYCCRUZ."  (Id. ¶ 11.)  The FBI also obtained subscriber records from the Internet service provider used by REYCCRUZ to log into Instagram.  (Compl. ¶¶ 10–11.)  Those records revealed that the IP address associated with REYCCRUZ was registered to a female subscriber, later identified as Defendant's mother.  (Id. ¶ 10.)  Searches of law enforcement databases revealed that Defendant was living at the subscriber's address.  (Id. ¶ 11.)  Photographs of Defendant from the same databases also matched photographs sent by REYCCRUZ depicting the user's face.  (Id. ¶ 12.)  Defendant does not now dispute that he is the Instagram user REYCCRUZ.

On April 29, 2014, the FBI sought and obtained a warrant from Magistrate Judge Dolinger to search Defendant's residence for evidence relating to child pornography offenses (the "SDNY Warrant").  (See Gov't Mem., Ex. C.)  This is the warrant that is now challenged.  The affidavit in support of the SDNY Warrant set out details regarding the FBI's investigation, including background regarding the information received by the Guam Police Department, the consensual search of Victim-1's phone, and the Instagram communications retrieved by the FBI.  (Id. ¶¶ 7–8.)  The warrant's affiant, Special Agent Aaron Spivack, described and included extensive excerpts of those conversations.  (Id. ¶¶ 9–14.)  He also averred that Victim-1 sent REYCCRUZ "approximately five sexually explicit photographs of himself (constituting production and receipt of child pornography)," but he did not append or otherwise describe those images in any further detail.  (Id. ¶ 8.)  Relevant excerpts of his affidavit (the "Spivack Affidavit") follow:

- "I have reviewed the contents of the account produced in response to the [search] warrant [to Instagram]. The contents reflect that REYCCRUZ and [Victim-1] developed an online relationship and had sexually explicit discussions."

- "Over the course of a few days, 'REYCCRUZ' and [Victim-1] traded photographs and 'REYCCRUZ' asked [Victim-1] to provide sexually explicit photographs of himself. [Victim-1] provided 'REYCCRUZ' with approximately five sexually explicit photographs of himself (constituting production and receipt of child pornography).

'REYCCRUZ' provided [Victim-1] with approximately nine sexually explicit photographs of himself."

- "The following is an excerpt of the communications between [Victim-1] and 'REYCCRUZ' where the age of [Victim-1] was discussed:

| | |
|---|---|
| 'REYCCRUZ' | How old r u anyway? |
| [Victim-1] | Ok thx @ 'REYCCRUZ' |
| [Victim-1] | 11 |
| [Victim-1] | You |
| 'REYCCRUZ' | 21 |
| [Victim-1] | Oh ok |
| [Victim-1] | Hey where u live |
| 'REYCCRUZ' | You're really kool |
| 'REYCCRUZ' | I live in New York cuty |
| 'REYCCRUZ' | How about you? |
| [Victim-1] | Thx I live on Guam |
| 'REYCCRUZ' | Just thinking about u |
| 'REYCCRUZ' | Lol |
| 'REYCCRUZ' | Hoping I could see your body" |

- "The following are excerpts of some of the sexually explicit communications between [Victim-1] and 'REYCCRUZ':

| | |
|---|---|
| 'REYCCRUZ' | U ever made love? |
| [Victim-1] | Yes |
| [Victim-1] | Like that |
| 'REYCCRUZ' | You have? How? |
| 'REYCCRUZ' | With who? |
| [Victim-1] | A girl I am bisueal |
| [Victim-1] | Bisuxal I mean |
| 'REYCCRUZ' | Did u like it? |
| 'REYCCRUZ' | It felt good? |
| [Victim-1] | Ya but nevery with a guy |
| 'REYCCRUZ' | I wanna do it with u |
| 'REYCCRUZ' | We would take it slow |
| 'REYCCRUZ' | But mine is big |
| 'REYCCRUZ' | Do u like big ones or no? |
| [Victim-1] | Wow talking about that ok lol :O :O |
| 'REYCCRUZ' | Lol |
| 'REYCCRUZ' | I'm just being honest |
| 'REYCCRUZ' | I wanna show u |
| 'REYCCRUZ' | And I wanna see yours |
| 'REYCCRUZ' | I know I cant |
| 'REYCCRUZ' | =( |
| [Victim-1] | Lol ok so how much love will u make with me |
| 'REYCCRUZ' | We would make love all the to time |

4

| 'REYCCRUZ' | And it Wud be our little sevret |
| 'REYCCRUZ' | Unless you wanted to tell people |
| 'REYCCRUZ' | I would make love to u on the beach |
| 'REYCCRUZ' | Baby lemme see yours |
| 'REYCCRUZ' | Lol |
| [Victim-1] | Oh ok keeping secret from who |
| 'REYCCRUZ' | From everyone |
| 'REYCCRUZ' | Anyone you didn't want to lnow |
| 'REYCCRUZ' | I would keep it a secret from them |
| [Victim-1] | Oh ok like what where doing now |
| 'REYCCRUZ' | Yea |
| 'REYCCRUZ' | U wanna keep it a secret?" |

- "The following is an excerpt of the communications between [Victim-1] and 'REYCCRUZ' in which 'REYCCRUZ' asked [Victim-1] to show 'REYCCRUZ' his genitals:

| 'REYCCRUZ' | We can make cyber love |
| 'REYCCRUZ' | But that means we would have to send eaxhother pictures |
| 'REYCCRUZ' | And touch ourselves |
| 'REYCCRUZ' | Has your boyfriend seen yours? |
| [Victim-1] | What |
| 'REYCCRUZ' | Has he seen a picture of your beautiful part? |
| [Victim-1] | No why |
| 'REYCCRUZ' | Cuz that's what I wanna see |
| 'REYCCRUZ' | Send it to me whenever you're ready and I'll send mine back" |

- "The following is an additional excerpt where 'REYCCRUZ' engaged [Victim-1] in sexually explicit conversations. 'REYCCRUZ' asked to see nude photographs of [Victim-1] and offered to show [Victim-1] his genitals:

| 'REYCCRUZ' | I want someone to rub it and suck it |
| [Victim-1] | Lol just talk to me how y feel |
| 'REYCCRUZ' | My private hurts cuz it's so hard |
| 'REYCCRUZ' | And I just wanna mess around with a noy |
| 'REYCCRUZ' | And I wanna play with his too |
| 'REYCCRUZ' | Yours gets hard a lot? |
| [Victim-1] | Some times |
| 'REYCCRUZ' | Can you tell me what yours looks like? |
| 'REYCCRUZ' | /since y don't wanna send a pic@of it |
| [Victim-1] | It brown and kind of big |
| 'REYCCRUZ' | Is it hairy? |
| [Victim-1] | Ya |
| [Victim-1] | Your tribe |
| [Victim-1] | Your tribe |

|                |                                                        |
|----------------|--------------------------------------------------------|
| 'REYCCRUZ'     | Mine is big and fat                                    |
| 'REYCCRUZ'     | And hairy                                              |
| 'REYCCRUZ'     | Lol                                                    |
| [Victim-1]     | Lol ok                                                 |
| 'REYCCRUZ'     | U don't wanna see the picture                          |
| 'REYCCRUZ'     | I have a real man dick                                 |
| 'REYCCRUZ'     | I wanna know how big yours is                          |
| 'REYCCRUZ'     | What if it's bigger than mine?!                        |
| [Victim-1]     | Ok whatevery send one                                  |
| [Victim-1]     | Whatevery                                              |
| 'REYCCRUZ'     | U won't show anyone ?                                  |
| 'REYCCRUZ'     | And then u send me one too                             |
| 'REYCCRUZ'     | No one will find out                                   |
| 'REYCCRUZ'     | So delete the picture after u send it                  |
| 'REYCCRUZ'     | Do u at least wanna see mine? And then I will erase it? |
| [Victim-1]     | What u mean                                            |
| 'REYCCRUZ'     | Send me a picture                                      |
| 'REYCCRUZ'     | And then I will erase it                               |
| 'REYCCRUZ'     | As soon as I see it"                                   |

- "The following is another excerpt of the conversation between 'REYCCRUZ' and [Victim-1] where 'REYCCRUZ' asked [Victim-1] for additional photographs:

|                |                                                        |
|----------------|--------------------------------------------------------|
| 'REYCCRUZ'     | Send me a vid                                          |
| [Victim-1]     | I can't                                                |
| [Victim-1]     | My familey here                                        |
| 'REYCCRUZ'     | Another pic thwn                                       |
| [Victim-1]     | Ok wait                                                |
| 'REYCCRUZ'     | Ik                                                     |
| 'REYCCRUZ'     | Ok                                                     |
| [Victim-1]     | Going to delet this befor engine see                  |
| 'REYCCRUZ'     | Ok                                                     |
| 'REYCCRUZ'     | I wanna leave all the juice inside of u baby           |
| [Victim-1]     | Lol ok going to delete it k                            |
| 'REYCCRUZ'     | Ok                                                     |
| [Victim-1]     | Wow                                                    |
| 'REYCCRUZ'     | I wanna shower with u                                  |
| [Victim-1]     | Me two                                                 |
| 'REYCCRUZ'     | Lemme see your ass baby noy                            |
| [Victim-1]     | Got to go delet it                                     |
| 'REYCCRUZ'     | Love u mi amor                                         |
| 'REYCCRUZ'     | My love"                                               |

- "The following is an additional excerpt where [Victim-1] and 'REYCCRUZ' again discussed their respective ages:

6

| | |
|---|---|
| 'REYCCRUZ' | Yea if we got caught talking I Wud go@to jail |
| 'REYCCRUZ' | Shit |
| 'REYCCRUZ' | =( |
| 'REYCCRUZ' | But 11 |
| 'REYCCRUZ' | Is so cute |
| [Victim-1] | What so cute |
| 'REYCCRUZ' | You being 11 years old |
| 'REYCCRUZ' | It's cute |
| [Victim-1] | Thx and u being 21 |
| 'REYCCRUZ' | Lol |
| 'REYCCRUZ' | Lol |
| [Victim-1] | I live u too talk to u later on the pic u sent me going to delet this one k |
| 'REYCCRUZ' | Ok babe" |

(Id. ¶¶ 8–14.)

Judge Dolinger approved the warrant on April 29, 2014 and the FBI executed its search of Defendant's home the next morning.  (Id. ¶ 14.)  Defendant was located inside his home, interviewed, and then arrested.  He was presented on a criminal complaint before Judge Dolinger later the same day.  The indictment followed on May 16, 2014.  (See Dkt. 7.)  Defendant filed his pretrial motions on September 9, 2014 and October 28, 2014.  (See Dkt. 27 & 34.)  The Court denied Defendant's request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) on January 25, 2015.  (Dkt. 44.)  After two adjournments sought by the parties, a suppression hearing on those aspects of the motions not already decided or addressed herein is scheduled for February 25–26, 2015.

## II.   LEGAL STANDARD

The Fourth Amendment provides in relevant part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." See also Kentucky v. King, 131 S. Ct. 1849, 1856 (2011) ("a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity").  A law enforcement officer's affidavit

in support of a warrant must enable a magistrate to conclude there is probable cause to believe, first, "that a crime was committed," and second, that "evidence of such crime is located [in the place to be searched]."  United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983).

A magistrate's determination that probable cause exists to support the issuance of a search warrant "should be paid great deference by reviewing courts." Illinois v. Gates, 462 U.S. 213, 236 (1983).  Such deference derives not only from the law's recognition that probable cause is a "practical and common-sensical standard," Florida v. Harris, 133 S. Ct. 1050, 1055 (2013), that is not reducible to "precise definition or quantification," Maryland v. Pringle, 540 U.S. 366, 371 (2003), but also from its "strong preference" for searches conducted on the authority of a warrant, Gates, 462 U.S. at 236.  Thus, looking only at the information "contained within the four corners of a written affidavit given under oath," United States v. Falso, 544 F.3d 110, 122 (2d Cir. 2008) (internal quotation marks omitted), the task of a reviewing court is to ensure that the "totality of the circumstances" described therein afforded the magistrate "a substantial basis" for making the requisite probable cause determination.  Gates, 462 U.S. at 238; see also Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007).  The court must "resolve any doubt about the existence of probable cause in favor of upholding the warrant." United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998).

Nevertheless, deference has its limits, and it is for the reviewing court to "decide whether the magistrate performed his neutral and detached function on the facts before him, and did not merely serve as a rubber stamp for conclusions drawn by the police." Travisano, 724 F.2d at 345. "[A] mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" will not suffice, because the magistrate's finding "cannot be a mere ratification of the bare conclusions of others." Gates, 462 U.S. at 239.

### III.   DISCUSSION

**A.      Defendant's Claim that the SDNY Warrant Lacked Probable Cause**

In his affidavit, Agent Spivack averred that there was probable cause to believe that the premises in question—Defendant's residence—contained evidence, fruits, and instrumentalities of the production and receipt of child pornography.  Title 18, United States Code, Section 2256(8) defines "child pornography" as "any visual depiction, including any ... picture ... where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct."  Pursuant to § 2256(2)(A), "sexually explicit conduct" is defined as "actual or simulated (i) sexual intercourse ...; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person."

Based on the excerpts of the conversation in which Victim-1 plainly states that he is 11 years old, there should be no doubt that there was probable cause to believe Victim-1 was a minor. (See Spivack Aff. ¶ 9 (Victim-1 responding "11" after being asked "How old r u anyway?" ostensibly early in the course of their conversation); ¶ 14 (Defendant saying that Victim-1's being "11 … [i]s so cute.").)  Defendant does not make an argument to the contrary.  The sexually explicit nature of the photographs, however, requires further elaboration.

Defendant argues that the warrant fails because the Spivack Affidavit "neither appends the images [that allegedly constitute child pornography] nor [does it] provide[] any description whatsoever of the images."  (Def. Mem. 14.)  Indeed, there can be no disagreement that insofar as those images are concerned, the affidavit does not go beyond the conclusory assertion that "[Victim-1] provided 'REYCCRUZ' with approximately five sexually explicit photographs of himself (constituting production and receipt of child pornography)."  (Spivack Aff. ¶ 8.)  Such a conclusory description in isolation is fatal to the warrant, Defendant contends, pointing principally to United

States v. Groezinger, 625 F. Supp. 2d 145 (S.D.N.Y. 2009) and two decisions from the First and

Ninth Circuit Courts of Appeals.  See United States v. Brunette, 256 F.3d 14 (1st Cir. 2001); United

States v. Battershell, 457 F.3d 1048 (9th Cir. 2006).

Groezinger considered an affidavit that, much like the instant one, "[did] not describe the

images sent between the [relevant individuals] or state which category of child pornography they

fell into."  625 F. Supp. 2d at 150.  In holding that failure was fatal to a finding of probable cause,

the court ultimately adopted the reasoning of Battershell and Brunette.  Those decisions noted that

in contrast to the "[t]he first four categories [of sexually explicit conduct], [which] ... involve easily

identifiable nouns that are not qualified by amorphous adjectives," Battershell, 457 F.3d at 1051,

"the identification of images that are lascivious will almost always involve, to some degree, a

subjective and conclusory determination on the part of the viewer," Brunette, 256 F. 3d at 18; see

also Groezinger, 625 F.Supp.2d at 153.[2]  "That inherent subjectivity is precisely why the [probable

cause] determination should be made by a judge, not an agent."  Brunette, 256 F. 3d at 18.  Ac-

cordingly, the Groezinger court endorsed a rule whereby "courts must … require the law

enforcement officer either to append the allegedly lascivious material or ... to provide a description

that is sufficiently detailed for a magistrate to reach an independent legal conclusion that the ma-

terial is indeed lascivious."  Id. at 154 (citation and internal quotation mark omitted; second

alteration in original).[3]

---

[2] Groezinger also quoted United States v. Jasorka, 153 F.3d 58 (2d Cir. 1998) for the proposition that the fifth category of lascivious exhibition often "calls into play imprecise value judgments raising issues comparable to those that arise when testing for obscenity."  Id. at 60; see also Groezinger, 625 F. Supp. 2d at 153.  It should be noted, however, that Jasorka was quoting the district court for that proposition and never endorsed it, as the Groezinger court itself recognized in another opinion.  See United States v. Genin, 594 F. Supp. 2d 412, 421 (S.D.N.Y. 2009) (Jasorka "describe[ed] the district court's opinion but avoid[ed] [deciding] the issue").  Indeed, the Jasorka court explicitly stated that it "need not determine whether the district court was correct in concluding that the magistrate judge lacked sufficient basis to conclude [there was probable cause]." 153 F.3d at 60.

[3] Ostensibly, the Groezinger rule need only apply where the warrant affidavit identifies an image as being in the fifth category in § 2256(2)(A), or where the affidavit fails to identify which of the five categories an image falls within.  It is also worth noting that since Groezinger was decided, at least one other court of appeal—but not the

10

Unlike in <u>Groezinger</u>, however, the Spivack Affidavit contained more than an isolated assertion concerning the images—much more.  Indeed, the affidavit included lengthy excerpts of conversations between Defendant and Victim-1 where Defendant repeatedly expressed his desire to have sex with Victim-1 and repeatedly solicited pictures of the boy's penis.  The following excerpts make that much plain:

> Defendant:    I wanna show u[.] And I wanna see yours[.]  I know I can't =( …

> Defendant:    We can make cyber love[.]  But that means we would have to send eaxhother pictures[.]  And touch ourselves[.]  Has your boyfriend seen yours? … Cuz that's what I wanna see[.]  Send it to me whenever you're ready and I'll send mine back[.]

(Spivack Aff. ¶¶ 10–11.)  It is true, as Defendant points out, that at one point in the conversation Victim-1 appears reluctant to share a photograph of his penis.[4]  But a later excerpt strongly implies that at least two images were eventually shared:

> Defendant:    Send me a vid

> Victim-1:    I can't[.]  My familey here[.]

> Defendant:    *Another* pic thwn

> Victim-1:    Ok wait

> Defendant:    Ik[.] Ok[.]

> Victim-1:    Going to delet this befor engine see

> Defendant:    OK …

---

Second Circuit—has joined the First and Ninth.  <u>See</u> <u>United States v. Pavulak</u>, 700 F.3d 651, 661 (3d Cir. 2012) ("the label 'child pornography,' without more, does not present any facts from which the magistrate could discern a 'fair probability' that what is depicted in the images meets the statutory definition of child pornography and complies with constitutional limits").

[4] At one point Defendant stated: "Can you tell me what yours looks like? /since [you] don't wanna send a pic@of it[.]"  (Spivack Aff. ¶ 12.)

Victim-1:        Got to go *delet it[.]*

(Id. ¶ 13 (emphasis added).)  The common sense inference from Defendant's request for "another pic th[e]n"[5] and Victim-1's direction shortly thereafter to "delet[e] it" is that another—that is, at least a second picture—was shared by Victim-1.  Indeed, even if the magistrate were to ignore Agent Spivack's statement characterizing the pictures as "child pornography," that in no way precluded the magistrate from relying on Agent Spivack's affidavit for its independent factual assertion that pictures were shared.  Thus, based on the totality of the circumstances—an overtly sexual conversation that included multiple explicit requests by Defendant for pictures of Victim-1's penis—there was a substantial basis for the magistrate to conclude that those pictures were "sexually explicit" within the meaning of § 2256(2)(A).[6]

In light of the conclusion that the Spivack Affidavit was sufficient to establish probable cause independent of its characterization of the images, this case thus presents no need for the Court to opine on the rule set forth in Groezinger.  To be sure, some courts have counseled appending or describing images as the better practice.  See, e.g., United States v. Miknevich, 638 F.3d 178, 184 (3d Cir. 2011) (identifying appending or describing images as "the better practice"); United States v. Syphers, 426 F.3d 461, 467 (1st Cir. 2005) (identifying same as "[t]he best practice").  Indeed, in this case, doing so may well have meant little more than reiterating Agent Dodd's

---

[5] The Court infers this was a typographical error, like many others, as the letters "w" and "e" are located next to each other on a standard keyboard.

[6] Defendant also offers two additional arguments, both of which can be dispensed with briefly.  First, Defendant argues that "Agent Spivack does not say whether he personally reviewed the images." (Def. Mem. 17.)  Agent Spivack's affidavit, however, plainly states that he has "reviewed the contents of the account produced in response to the warrant." (Spivack Aff. ¶ 8.)  Because there is no basis to imply the "contents" somehow excludes the images, this argument is unavailing.  Second, Defendant argues "the affidavit contains no information about Agent Spivack's credentials, qualifications, training or expertise … with respect to the determination of what types of images or materials constitute child pornography."  (Def. Mem. 17–18.)  Because Agent Spivack's characterization of the images as "child pornography" was not necessary to support the magistrate's conclusion that probable cause existed, this argument also fails.

straightforward characterization that Victim-1 had sent Defendant "five pictures of his erect genitalia." (Gov't Mem, Ex. B ¶ 11.) Nonetheless, the <u>Groezinger</u> approach is not universally endorsed. <u>See</u> <u>United States v. Simpson</u>, 152 F.3d 1241, 1247 (10th Cir. 1998) ("the words 'child pornography' need no expert training or experience to clarify their meaning") (citation and some internal quotation marks omitted); <u>United States v. Smith</u>, 795 F.2d 841, 848 (9th Cir. 1986) ("As to the affidavit's 'conclusory' statement that the photographs depicted 'sexually explicit conduct,' we do not find the character of the allegation fatal to the warrant.").[7]

Moreover, the question remains unsettled in this circuit. Although the Court of Appeals has recognized that the reference to "lascivious exhibition" in § 2256(2)(A)(v) is "is an elusive concept" that is "less readily discernable than the other, more concrete types of sexually explicit conduct listed," <u>United States v. Rivera</u>, 546 F.3d 245, 249 (2d Cir. 2008) (internal quotation marks and citations omitted), it has not adopted the bright-line rule that <u>Groezinger</u> endorsed. Indeed, when first presented with an opportunity to do so, it expressly demurred in favor of leaving the question open. <u>See</u> <u>United States v. Jasorka</u>, 153 F.3d 58, 61 (2d Cir. 1998) ("the law is unclear whether a judicial officer acting on a warrant application for a violation of § 2252, based on lascivious exhibition of the genitals, may rely on an agent's assertion that he has reviewed the material and has found the photographs include such conduct").[8]

Finally, even if the Court were to assume that the warrant here was not supported by probable cause, the good faith exception would apply. Suppression is "our last resort, not our first

---

[7] At least one additional case has concluded that a generalized description is sufficient, but did so in the context of whether the search warrants were sufficiently particularized with respect to the materials to be seized, not in the context of the probable cause determination. <u>See</u> <u>United States v. Kimbrough</u>, 69 F.3d 723, 727–28 (5th Cir. 1995) ("Identification of visual depictions of minors engaging in sexually explicit conduct … is a factual determination that leaves little latitude to the officers.").

[8] The Second Circuit again declined, albeit implicitly, to address the question in <u>United States v. Genin</u>, 524 F. App'x 737, 738 (2d Cir. 2013).

impulse" in addressing violations of the Fourth Amendment.  <u>Herring v. United States</u>, 555 U.S. 135, 140 (2009) (<u>quoting</u> <u>Hudson v. Michigan</u>, 547 U.S. 586, 591 (2006)).  The Supreme Court has thus long recognized an exception to the exclusionary rule for "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant."  <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984).  There can be no serious debate about reasonable reliance here because, as the Second Circuit has itself observed, the law on this issue is still evolving.  <u>See</u> <u>Jasorka</u>, 153 F.3d at 61.  Nor is there any other basis to find suppression appropriate in the circumstances.  <u>See</u> <u>United States v. Moore</u>, 968 F.2d 216, 222 (2d Cir. 1992) (identifying the four parameters in <u>Leon</u> that point toward exclusion).

## B.     Defendant's Claim that the SDNY Warrant was Improperly Executed at Night

Defendant also argues that evidence should be suppressed because the FBI agents who executed the SDNY Warrant improperly entered his home between 15 and 30 minutes before the authorized time of 6:00 a.m.  (Def. Mem. 22–25; <u>see also</u> Decl. of Daniel DeMaria (Dkt. 28), Ex. F–J.)  The Government disputes that the agents entered before 6 a.m.  (Gov't Mem. 26.)  However, even if the Court accepts Defendant's claim that the agents entered his home prior to the authorized time as true for present purposes, this argument fails.

The Federal Rules of Criminal Procedure provide that a search warrant must be executed "during the daytime, unless the judge for good cause expressly authorizes execution at another time."  Fed. R. Crim. P. 41(e)(2)(A)(ii).  "'Daytime' means the hours between 6:00 a.m. and 10:00 p.m. according to local time."  Fed. R. Crim. P. 41(a)(2)(B).  The Second Circuit has counseled that "violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision

in the Rule." United States v. Burke, 517 F.2d 377, 386–87 (2d Cir. 1975); see also Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded").

Although the Court is mindful that an inquiry into prejudice and intentional disregard may, in appropriate circumstances, warrant a hearing, a hearing would be inappropriate here because Defendant fails to "state sufficient facts which, if proven, ... require[] the granting of the relief requested." United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969); see also In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 157, 165 (2d Cir. 2008) ("an evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question"); United States v. Castellano, 610 F. Supp. 1359, 1439 (S.D.N.Y. 1985) ("No evidentiary hearing need be held where a defendant's allegations are general and conclusory or are based upon suspicion and conjecture.").

Defendant's principal assertion is that "those who are awakened by federal agents (or others) while asleep will experience great stress and diminished cognitive functioning when first awakened, which may cause them to believe that they are about to be robbed (or worse), potentially causing them to take actions to defend themselves thereby escalating the potential for violence." (Def. Reply 14.)  This amounts to generalized speculation, not a claim of actual prejudice.  In any event, there is no suggestion in Defendant's moving papers that the search would have been less abrasive if executed at 6 a.m. because, for example, he would have been awake then and thus not subject to the same "great stress and diminished cognitive functioning."  Furthermore, Defendant

does not allege intentional and deliberate disregard by the agents. Thus, even accepting Defendant's claim that the agents entered his home between 15 and 30 minutes prior to the authorized time, exclusion is inappropriate in these circumstances.

## IV.   CONCLUSION

For these reasons, Defendant's motion to suppress physical evidence seized on the basis of the SDNY Warrant's lacking probable cause and having been improperly executed at night is DENIED. The motion it its remaining aspects will be addressed after the evidentiary hearing scheduled for February 25–26, 2015.

SO ORDERED.

Dated:   February 24, 2015
          New York, New York

_____
Ronnie Abrams
United States District Judge