UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA,

     vs.        No. 14-CR-314 (RA)

RENE CARDONA,

-------------------------------------------------------x

## RENE CARDONA'S SENTENCING MEMORANDUM

        Daniel DeMaria, Esq. (DD4130)
        Merchant Law Group LLP
        75 South Broadway, Suite 409
        White Plains, New York 10601

        Carlos Moreno, Esq. (CM5375)
        Carlos Moreno Law Office
        330 7th Avenue, 4th Floor
        New York, New York 10001

United States Attorney (SDNY)
AUSA Andrew DeFilippis, Esq.
AUSA Gina Castellano, Esq.
One St. Andrew's Plaza
New York, New York 10007

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARREST AND BENCH TRIAL ON STIPULATED FACTS....................................1

SENTENCING GUIDELINES....................................................................................2

SENTENCES IN CHILD PORNOGRAPHY CASES.................................................2

DR. KRUEGER'S PSYCHO-SEXUAL ANALYSIS.................................................5

18 U.S.C. § 3553(a)....................................................................................................6

    1.    The Nature and Circumstances of the Offense and History and
Characteristics of the Offender....................................................................7

        (A)    The Nature and Circumstances of the Offense.......................7

        (B)    The History and Characteristics of the Offender....................9

    2.    The Need for the Sentence Imposed to:.....................................................10

        (A)    Reflect the Seriousness of the Offense, Promote Respect for
the Law and Provide Just Punishment for the Offense..........10

        (B)    Afford Adequate Deterrence to Criminal Conduct...............13

        (C)    Protect the Public from Further Crimes of the Defendant.....13

        (D)    Provide the Defendant with Needed Training and
Treatment...............................................................................14

CONCLUSION............................................................................................................15

## PRELIMINARY STATEMENT

This is a tragic case. The Defendant, Rene Cardona, was a victim of sexual abuse for many years as a child. While the fact that he was sexually abused in no way justifies or excuses his conduct, society's visceral reaction to his crime should be tempered by awareness of its possible roots. Regardless of its cause, Mr. Cardona is the first to admit that he committed a very serious crime deserving of serious punishment.

Mr. Cardona's plea that he be sentenced to the fifteen year mandatory minimum is not just an appeal to sympathy, but takes into account his candor and cooperation with law enforcement, his remorse, his acceptance of responsibility, his unique and tragic familial circumstances, his prognosis for rehabilitation, the fact that he does not have a criminal record, and his positive accomplishments. Even the mandatory minimum is severe by any measure. Given that Mr. Cardona will be required to register as a sex offender upon his release from prison and can be placed on lifetime supervised release, no sentence greater than the fifteen year mandatory minimum is necessary to achieve the purposes of sentencing outlined in 18 U.S.C. § 3553(a).

## ARREST AND BENCH TRIAL ON STIPULATED FACTS

Mr. Cardona has been in custody since his arrest on April 30th, 2014. Mr. Cardona was respectful with law enforcement authorities at the time of his arrest, cooperated fully, and

gave a full confession.  On May 16th, 2014, Mr. Cardona was indicted for: (i) two counts of production of child pornography; (ii) receipt of child pornography; (iii) distribution of child pornography; and (iv) possession of child pornography. On April 9th, 2015, following a bench trial on stipulated facts, Mr. Cardona was found guilty of all counts. Sentencing is scheduled for August 20th, 2015.

## SENTENCING GUIDELINES

According to the PSR, Mr. Cardona's total offense level is 40. His criminal history category is I (PSR ¶ 115). Thus, his guideline imprisonment range is 292 months to 365 months. Probation recommends a sentence of 240 months on all counts, to be served concurrently (PSR p. 28). Importantly, Probation recognizes that Mr. Cardona accepts responsibility for his conduct and recommends a three point reduction pursuant to U.S.S.G. § 3E1.1(a) and (b) (PSR ¶ 76-77).

## SENTENCES IN CHILD PORNOGRAPHY CASES

It is not uncommon for federal judges to sentence those charged with production of child pornography to the fifteen year mandatory minimum. See, e.g., United States v. Richard Hastings, 14 Cr. 139 (GLS) (NDNY) (imposing sentence of 180 months despite guidelines range of life); United States v. Sierra Danyelle Halsey, 13 Cr. 164 (E.D. Va.) (imposing sentence of 180 months despite Guidelines range of 600 months); United States v. Nicholas

William Soto, 2014 Cr. 110 (E.D. Wash.) (imposing sentence of 180 months despite guidelines range of 262 to 327 months); United States v. Shane M. Sells, 14 Cr. 248 (E.D. Wis.) (imposing sentence of 180 months despite guidelines range of 210 to 262); United States v. Paul Henry, 14 Cr. 64 (D. Me.) (imposing sentence of 180 months); United States v. Rube, 14 Cr. 322 (W.D. Tex.) (imposing sentence of 180 months); United States v. Matthew B. Puterbaugh, 14 Cr. 200 (M.D. Pa.) (imposing sentence of 180 months); United States v. Gabriel Simmons, 10 Cr. 318 (D. Wyo.) (imposing sentence of 180 months); United States v. Johnny Ray Martinez, 2014 Cr. 15 (N.D. Tex.) (imposing sentence of 180 months); United States v. Jeremy Brendan Sears, 2014 Cr. 274 (C.D. Cal.)  (imposing sentence of 180 months); United States v. Ray Carl Short, 14 Cr. 27 (D. Idaho) (imposing sentence of 180 months); United States v. Dale Wray Fulford, 14 Cr. 14 (N.D. Tex.) (imposing sentence of 180 months); United States v. Kyle Unterbrink, 14 Cr. 297 (W.D. Tex.) (imposing sentence of 180 months); United States v. Jeremy L. Wallace, 13 Cr. 285 (S.D. Ohio) (imposing sentence of 180 months); United States v. Nicholas Pinto, 8 Cr. 325 (M.D. Pa) (imposing sentence of 180 months); United States v. Gary A. McArthur, 12 Cr. 30137 (S.D. Ill.) (imposing sentence of 180 months); United States v. Derrick Gossett. 13 Cr. 604 (S.D. Tex.) (imposing sentence of 180 months); United States v. Timothy Wayne Pollock, 11 Cr. 17 (N.D. Fla.) (imposing sentence of 180 months); United States v. Mitchell Duane Porter, 11 Cr. 95 (E.D. Tx.) (imposing sentence of 180 months); United States v. Stanley Weems., 11 Cr. 71 (E.D. Tenn.) (imposing sentence of 180 months);  United States v. Eric Whitson, 12

Cr. 67 (E.D. Ky.) (imposing sentence of 180 months); United States v. Robert Ririe, 10 Cr. 820 (D. Utah); and United States v. Benito Delgado Jr., 7 Cr. 245 (S.D. Tx.) (imposing sentence of 180 months).

Production of child pornography cases in the Southern District of New York are seemingly rare. In other child pornography cases judges in the Southern District of New York often impose sentences well below the guideline range. See, e.g., United States v. David Santana, 08 Cr. 1112 (LAK) (imposing sentence of 24 months' incarceration despite Guidelines range of 97-120 months); United States v. Ira Kemp, 09 Cr. 658 (JSR) (imposing 60 months' incarceration despite Guidelines range of 210-262 months); United States v. Hector Garcia, 10 CR 914 (BSJ) (imposing sentence of 5 years' probation despite Guidelines range of 87-108 months);   United States v. Michael Jin, 09 Cr. 678 (RJS) (imposing probation despite Guidelines range of 57-71 months); United States v. Robert Santana, 10 Cr. 341 (SHS) (imposing probation, despite Guidelines range of 51-63 months); and United States v. Jason Arberger,(08 Cr. 894) (AKH) (imposing probation, despite Guidelines range of 41-51 months).

Appellate courts have consistently upheld below-guideline sentences in child pornography cases when the facts considered pursuant to 18 U.S.C. § 3553(a) warranted such a sentence. See e.g., United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010) (holding within Guidelines child pornography sentence procedurally and substantively unreasonable); United

<u>States v. Stall</u>, 581 F.3d 276, 286, 289 (6th Cir. 2009) (upholding as substantively and procedurally reasonable a sentence of one day of incarceration and ten years of supervised despite Guidelines range of 57-71 months); <u>United States v. Duhon</u>, 541 F.3d 391, 399 (5th Cir. 2008) (upholding as substantively reasonable a sentence of 5 years probation despite Guidelines range of 27-33 months); <u>United States v. Rowan</u>, 530 F.3d 379, 381 (5th Cir. 2008) (upholding sentence of 5 years probation despite Guidelines range of 46-57 months incarceration).

## <u>DR. KRUEGER'S PSYCHO-SEXUAL ANALYSIS</u>

Following his arrest, Mr. Cardona was evaluated by Dr. Richard Krueger, an expert in the field of sexual offenders. A copy of Dr. Krueger's report and his curriculum vitae are attached hereto at **Exhibit "A"** ("Krueger Report"). Dr. Krueger is a highly-regarded psychiatrist. He is an expert in forensic psychiatry, addiction psychiatry, sexual offenders, sexual misconduct, and the psychopharmacological and behavioral treatment of paraphilias and sexual disorders. Dr. Krueger is a graduate of Harvard Medical School and an Associate Clinical Professor of Psychiatry at Columbia University. He is also on the faculty of the Columbia-Cornell Fellowship Program in Psychiatry and the Law. He is Medical Director of the Sexual Behavior Clinic and an attending psychiatrist at New York State Psychiatric Institute. He is also an attending psychiatrist at Columbia-Presbyterian Medical Center. Dr. Krueger is a board member and President of the New York State Association for Treatment

of Sexual Abusers and, notably, is a member of the Sexual Health and Disorders Committee of the World Health Organization. In addition to spending a lengthy period of time evaluating Mr. Cardona, Dr. Krueger has also consulted with counsel and reviewed the allegations, including the materials underlying the charges of conviction (Krueger Report at p. 1-2).

Dr. Krueger's Report reveals that based on the Sex Offender Need Assessment Rating(SONAR), Mr. Cardona has a low to moderate risk of re-offending (Krueger Report at p. 9). Significantly, Dr. Krueger considers Mr. Cardona "highly motivated and intelligent with a good prognosis for therapy." (Krueger Report at p. 10). As Dr. Krueger notes, Mr. Cardona's "risk of re-offense going forward can be reduced by successful treatment of his sexual and substance use disorders and by the usual conditions of monitoring and treatment imposed upon release from prison."(Krueger Report at p. 10). Dr. Krueger's recommendation should figure prominently in the Court's decision.

## 18 USC § 3553(a)

Section 18 U.S.C. § 3553(a) requires a sentence that is "sufficient, but not greater than necessary" to satisfy specific sentencing goals, including just punishment, deterrence of future criminal conduct, protection of the public, correctional treatment, and the prevention of unwarranted sentencing disparities. 18 U.S.C. §3553(a)(2). Section 3553(a) further directs courts to consider the applicable Sentencing Guidelines, "the nature and circumstances of the offense," and "the history and characteristics" of the defendant.

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statutory language overrides the advisory policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. See U.S.S.G. § 5H1. These factors are precisely "the sort of characteristics a court is likely to find relevant when determining the 'history and characteristics of the defendant' as required by § 3553(a)(1)." United States v. Simon, 361 F.Supp.2d 35, 40 (EDNY 2005).

**1. The Nature and Circumstances of the Offense and History and Characteristics of the Offender.**

*(A) The Nature and Circumstances of the Offense*

The offense is a serious one. Mr. Cardona induced an 11 year old boy (Victim-1) to take and send four sexually explicit images and one video of himself to Mr. Cardona over the internet (PSR p. 29). Mr. Cardona also induced a 14 year old boy (Victim-2) to engage in sexually explicit conduct and produced a video recording of himself engaging the victim in oral sex. *Id.* Mr. Cardona subsequently distributed a sexually explicit image of Victim-2. *Id.* In addition, Mr. Cardona had between 300 and 600 sexually explicit images of minors in his possession. *Id.*

In mitigation, the images and the video which Mr. Cardona received from Victim-1 were never distributed. Only one of the images of Victim-2 was distributed. *Id.* Mr. Cardona's very limited distribution of the child pornography he produced is important. One of the primary harms that child pornography laws are intended to address is the re-victimization of children every time the images and videos are viewed. Given that only one of the images which Mr. Cardona produced was ever distributed, that harm is lessened in this case. Thus, the most serious part of his crime was not so much the production of child pornography but the sexual abuse of a minor -  a crime which is typically prosecuted at the state level and which usually carries far lower sentences. See  United States v. Broxmeyer, 699 F.3d 265, 303 (2d Cir. 2012) (Jacobs, dissenting) ("A statutory maximum is appropriate only for the worst offenders. Unfortunately, we have seen such defendants. They are people who force small children to engage in sexual and sadomasochistic acts, who photograph or video the scene, and who broadcast it to the world, leaving the children with the pain of the experience and the anguish of knowing that degenerates are gloating over their abuse and humiliation"); New York v. Ferber, 458 U.S. 747, (1982) ("The materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation"). See also, Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110  358, Tit. I, § 102(3), 122 Stat. 4001, 4001 ("Child pornography is a permanent record of a child's abuse and the distribution of child pornography images revictimizes the child each time the image is viewed."); Adam Walsh Child Protection and Safety Act of

2006, Pub. L. No. 109 248, § 501(2)(D), 120 Stat. 587, 624 ("Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse");

Additionally, the vast majority of the child pornography recovered from Mr. Cardona was soft core in nature. The amount of pictures depicting prepubescent minors is minimal.

*(B) The History and Characteristics of the Offender.*

Mr. Cardona was born in Queens, New York (PSR ¶ 86). He has lived in the New York area his entire life (PSR ¶ 92). He has four maternal half-sisters, and was raised in a single parent household (PSR ¶ 89). His father passed away when he was only six years of old (PSR ¶ 86). His older brother died of a heroin overdose a few months later (Krueger Report at p. 4). Mr. Cardona suffered extensive, relentless bullying that began in elementary school, at a distressingly young age. *Id*. As a result, he felt depressed as a child and has cried a great deal during his life (PSR ¶ 87). At the age of 14, Mr. Cardona was repeatedly raped and sexually abused by a male neighbor in his forties (PSR ¶ 88). He was diagnosed with HIV in 2012 (PSR ¶ 96) Mr. Cardona's HIV is worsening due to his incarceration (PSR ¶ 96). In his report, Dr. Krueger confirms that Mr. Cardona has a "history of a major depressive disorder" (Krueger Report at p. 11).

Aside from the conduct in this case, Mr. Cardona's history appears exemplary. He has no criminal record (PSR ¶ 79-84). At the time of his arrest, Mr. Cardona was enrolled at John Jay College (PSR ¶ 106). From 2012 to 2014, he worked approximately 15 hours a week at Bronx Works (PSR ¶ 109). He appears to have been financially responsible, never filing for bankruptcy or amassing large debts (PSR ¶ 111). Mr. Cardona was very active in his church and has a close knit group of family and friends who continue to support him (PSR ¶ 87).

Attached hereto at **Exhibit "B"** are reference letters from Mr. Cardona's family and friends. The letters bear testament to Mr. Cardona's love of family, generosity, and all of the support which is available to him during his incarceration and upon his release from prison. Mr. Cardona's friends and family describe him as considerate, thoughtful and reliable. Despite the nature of his crime, Mr. Cardona's family and friends have stood by him and continue to support him as evidenced by the fact that in excess of 10 people have been present at each of his post-indictment court appearances.

### 2. The Need for the Sentence Imposed to:

*(A) Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense.*

A sentence of 15 years reflects the seriousness of the crime, promotes respect for the law, and provides punishment. No one doubts such a punishment is severe for a first-time offender. In this case, Mr. Cardona's acceptance of responsibility weighs against the need

-10-

for any greater punishment. Charges involving child pornography and child molestation frequently go to trial notwithstanding overwhelming evidence because many defendants cannot admit what they have done due to the shame associated with the crime. Some pedophiles remain in denial by rationalizing their behavior on the misguided grounds that a child was "sexually provocative" or that the experience had "educational value." See United States v. Kise, 369 F.3d 766, 773 (4th Cir. 2004) (citing the DSM-IV's discussion of pedophiles).

Courts have often cited a defendant's lack of remorse as one factor warranting a severe sentence in child pornography cases. See United States v. Oehne, 698 F.3d 119 (2d Cir. 2012) (noting with approval district court's reliance on defendant's attempt to "downgrade" crime in upholding sentence); United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (citing defendant's blame of his victims rather than himself and general lack of remorse as aggravating factor warranting 30 year sentence); U.S. v. Curtis, 2013 WL 1196878, 6 (11th Cir. 2013) (upholding district court's 360 month sentence in part because defendant's "lack of remorse and blame towards the victim outweighed" the fact that he had only minor criminal history); United States v. Christie, 624 F.3d 558, 574 (3d Cir. 2010) (upholding lengthy sentence as reasonable in part because defendant expressed no remorse).

Mr. Cardona, by contrast, has accepted responsibility and is remorseful for his conduct. These factors should be weighed heavily in this case. By opting for a bench trial on

stipulated facts, Mr. Cardona spared his victims (and jurors) the trauma of a trial. At no time did he try to deny or rationalize his wrongful conduct. He even gave a full confession to the FBI during the execution of the search warrant at his residence.

Upon his release from prison, Mr. Cardona will have to register as a sex offender for a lengthy period of time, if not life, which will lead to the publication of his crime to the entire community. Collateral consequences of conviction, such as sex offender registration, are relevant to the "need" for the sentence imposed to reflect just punishment. See, e.g., United States v. Garate, 543 F.3d 1026, 1028 (8th Cir. 2008) (overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender under § 3553); United States v. Pauley, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct" in a child pornography case because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," and "adequate deterrence").

Whatever his prison term, following his sentence Mr. Cardona will have gone from being a well-liked member of society to a registered sex offender and social pariah. Surely this is part of his punishment and lessens any need for additional incarceration solely to reflect that sentencing goal.

Moreover, the Court should take into consideration the fact that sex offenders like Mr. Cardona are often mistreated by other inmates in prison. See for example, ABC News, Prison Is 'Living Hell' for Pedophiles (Attached hereto at **Exhibit "C"**).

### (B) Afford Adequate Deterrence to Criminal Conduct

A sentence of 15 years is widely viewed as severe and will provide general deterrence to criminal conduct. Normally sentences of such length are imposed only for repeat violent offenders. Such a sentence will surely provide sufficient specific deterrence for a defendant who has never before set foot in jail.

### (C) Protect the Public from Further Crimes of the Defendant

Mr. Cardona's history and characteristics make him a very low risk to re-offend. According to the Sentencing Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases", from 29% for offenders under age 21 (Criminal history category I), down to 12.1% for offenders age 36 to 40 at the time of sentence. See U.S. Sentencing Commission, Measuring Recidivism (May 2004) at 12 & Ex. 9 (Excerpts attached hereto at **Exhibit "D"**). Mr. Cardona will be near 40 when released even if he receives the statutory minimum.

Moreover, Mr. Cardona will be required to undergo treatment as a condition of his supervised release. In a recent report to Congress concerning child pornography, the

Sentencing Commission reported that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism - some of them very significant.'" U.S. Sentencing Commission Report to Congress: Child Pornography Offenses (December 2012) at 278 & n. 30 (Excerpts attached hereto at **Exhibit "E"**).

Additionally, the effectiveness of post-release supervision cannot be overstated. The Probation Department for the Eastern District of New York reported to Senior Judge Jack Weinstein that even though many of its child pornography supervisees had prior sexual contact with minors     "[m]uch to the credit of our supervising officers and treatment providers, we have had only 1 known offender convicted of [a] child pornography offense who committed a new sexual contact offense while under the supervision of this department, which we are aware of." (See Memorandum to the Honorable Jack B. Weinstein from Eileen Kelly, Exhibit E to Memorandum and Order (Doc. # 140-3), in United States v. C.R., 09-CR-155 (JBW) (attached hereto and marked as **Exhibit "F"**) The demonstrated effectiveness of the Probation Department at supervising sex offenders lessens the need for a lengthy sentence for incapacitation alone.

*(D) To Provide the Defendant with Needed Training and Treatment*

Mr. Cardona is in need of sex offender treatment and substance abuse treatment. The BOP's Residential Sex Offender Treatment Program lasts 12-18 months and the minimal custodial sentence to ensure placement in the program is 27 months. See, BOP Sex Offender

-14-

Program (February 15th, 2013) at 16 and 23  (Excerpts attached hereto at **Exhibit "G"**). The remainder of Mr. Cardona's treatment will take place while he is on supervised release. As detailed in the memo submitted by the Probation Department in C.R., sex offenders undergo intensive treatment including weekly group and individual sessions as well as polygraphs. Given the brevity of the BOP's program, whatever sentence Mr. Cardona receives above 180 months will likely lessen the amount of treatment he receives.

## <u>CONCLUSION</u>

This is a very tragic case. Mr. Cardona went from abused to abuser. If the Court agrees that a sentence of 180 months is appropriate in this case, Mr. Cardona's reaction will most assuredly not be "oh I got away with one, I can do it again." To the contrary Mr. Cardona's reaction will be overwhelming gratitude to the Court for giving him a second chance at life. Mr. Cardona most respectfully does not need a life sentence to teach him a lesson. That lesson was learned when he first met counsel who described to him his legal situation and the potential sentence he was facing due to his conduct - fifteen years mandatory minimum. That lesson has been entrenched in his mind never to be forgotten. The lesson will be  reinforced every time he is told by a correctional officer what to do and when to do it. Coupled with sex offender and substance abuse treatment it is unlikely that Mr. Cardona will ever commit another crime.

Dated:          White Plains, New York
                July 27 ,<sup>th</sup>2015
                                              _____
                                                  Daniel DeMaria, Esq. (DD4130)

                                              Merchant Law Group LLP
                                              75 South Broadway, Suite 409
                                              White Plains, New York 10601
                                              Tel: 212-658-1455
                                              Fax: 877-607-5419
                                              ddemaria@nyslitigators.com


                                              Carlos Moreno, Esq. (CM5375)
                                              Carlos Moreno Law Office
                                              330 7th Avenue, 4th Floor
                                              New York, New York 10001
                                              Tel: 212-631-7555

# EXHIBIT "A"

FILED UNDER SEAL

# EXHIBIT "B"



**Evelyn Cardona**
████████████████████, **New York, NY 10040**
9███████

June 16, 2015

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, NY  10007

Dear Judge Abrams:

This is regarding my Son, Rene Cardona.  Rene is a very kind and humble young man.  As a kid, he always attended specialized schools because he always had good grades in school.  Teachers never gave me complaints about him.  He had the opportunity to travel to Japan in an exchange student program.

Rene was sometimes depressed because of the lost of his Father.  He was really close to his Father and lost him at the age of 6.  As a family, we are all saddened because of this crime.  My daughters and I are very sad because he never got into any type of trouble before.  Rene is also very sorry and remorseful for the crime.  I talk to him about the same, and he says that he is sorry for the decisions he has made and the hurt he has caused.  He told me that he was on drugs when he did what he did.  That breaks my heart even more, because I also lost a Son due to drugs.  Though he has made poor decisions, deep inside Rene is not a bad person.  I think he deserves a second chance, please.  In his job, he was a reliable worker and never missed a day of work.  I use to work as a teacher's aid in Puerto Rico and have been working as a health aid in New York for many years until I was injured in my job.  Right now, I am on disability and have a lot of complications.  Please, if you could recommend that Rene is not sent too far away because it would be impossible for me to see him.

Thank you for this time reading this letter.  Also, as a family we love Rene and will always be there for him.  He is the youngest of the family.

Sincerely,

Evelyn Cardona

Vilma C. Lebron

████████████████

Staten Island, NY  10301

June 17, 2015

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, NY  10007

Dear Judge Abrams:

I am writing on behalf of Rene Cardona.  I am Rene's sister, Vilma C. Lebron and I work as a home attendant in Staten Island, NY.  I've known Rene all his life and know him to be a warm, positive and good person.  Our Mother raised him with good principles and values.  Our family has been through so many different challenges in life, yet Rene was able to finish High School and was never in trouble with anyone.  Rene was always very helpful and is a hard worker and very responsible.  He took care of our Mom after all his siblings moved out and as a young man helped her financially.  He has such a warm heart and always looks for ways to help others.  He has a wonderful voice and talent as a musician, which he used actively at the Church he congregated at.

I am aware of the crime he committed and know he is very sorry.  I know he is sorry because of what he has spoken to me.  He has told me that he is extremely sorry and that he wishes he had a chance to undo all the wrong he has done.  I wish my brother well and I pray that God may protect Him and that His faith will redeem him and carry him through. I love my brother very much and know that he is hurt for what he has done and regretful for the pain he has caused others and the shame caused on our Mother.

Sincerely,

*Vilma C. Lebron*
Vilma C. Lebron

**Barbara Lebron**

███████████████

Staten Island, NY 10301

████████████████

June 16, 2015

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, NY  10007

Dear Judge Abrams:

My name is Barbara Lebron.  I am Rene Cardona's sister and have known him all his life.  My brother is such a loving person and always demonstrated a disposition to serve others.  He has spent most of his life in the church and has been active and helpful in charity efforts and helping the needy in the community. My memories of Rene are all cherished ones.  He got along with everyone and never had any kind of trouble with anyone.  I believe strongly that deep in his heart is much good because that is all that I've witnessed from him throughout the years.  He was a good student at school and started college and spoke frequently about wanting to continue his studies.  He is a smart young man and I know he would have been able to make himself of a career.

He has made serious mistakes and he regrets them deeply.  We, his family, are also sorry for what he has done.  I can tell his regret when I speak to him and he tells me that he is so sorry for what he has done and that he hopes God can forgive him as well as his family and those he's caused hurt.  I love my brother so much and pray that he can find restoration and do something positive in his life.

Sincerely,

*Barbara Lebron*

Barbara Lebron

The honorable Ronnie Abrams
United states District court
Southern District of New York
40 Foley square New York, NY 10007

06/27/2015

Dear judge Abrams,

   I Lourdes Ramos sister of Rene Cardona have known Rene
for all of his life, Rene is a kind and loving person he likes to
bring peace in every situation, he is a great pianist and singer, he
writes lyrics and likes to help people. I acknowledge Rene's
wrong doing and know that he is very sorry and regretful of
what he has done. He has apologized to the family in great
remorse. Rene has always been a great help to our mother and is
always there for her lending her a hand, he also was very helpful
in church activities helping to raise funds and always
participating in music. Rene was enrolled in John Jay college,
Rene was reliable and responsible with his job.

*Lourdes Ramos*
Lourdes Ramos

Staten island, NY 10304

**Eddie Espadero**

████████████████████████ Staten Island, NY  10301

████████████

June 16, 2015

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, NY  10007

Dear Judge Abrams:

My name is Eddie Espadero and I'm Rene Cardona's nephew.  My Uncle is a great person and he has been a positive role model in my life.  Growing up, I always enjoyed having him around.  He was fun and always made me laugh.  He always gave me good advice and would tell me about the importance of staying in school and getting an education.

My Uncle has a good heart and always looked for ways to help others.  He helped in his Church when they did activities to help the neighborhood and he enjoyed giving to charity.  He is a musician.  He loves to sing and he plays the Keyboard.  He would spend many hours writing Christian songs and creating music for his songs.  His songs were always positive and inspirational.

I am aware of the crime he has committed and I know that he is really sorry for his actions.  I can tell every time I look at him.  I know he is hurt for disappointing my Grandma (His Mother) and I know he is worried about her.  He was the one that looked after my Grandma and helped her financially.  In my conversations with him, he has shared with me that he is really sorry for the things he has done and that he wishes he can make things right.  Although Rene has made really bad mistakes I still see him as my fun, loving Uncle and it hurts me to see him in the situation he is in.

Sincerely,

*Eddie Espadero*

Eddie Espadero

June 2, 2015

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Abrams,

My name is Andre Chavez and I am a friend of Rene Cardona. We became friends at the Iglesia Evangelica Pentecostal Sion Inc. I have known Rene for about two years. During my vacations from college, I would come back to the Bronx. At home, Rene and I would meet to hang out. My interactions with him showed me he is caring person. He spoke highly of his mother, Ms. Evelyn Cardona. He is also genuine.  From what I know and seen, Rene Cardona contributed to the church by becoming part of the worship team. He played the piano and sang. During the summers, the church would do community out reaches by providing free food and spreading the gospel through sermons on the streets. Rene would volunteer by distributing food and sing gospel music. From all of my recollections of Rene Cardona, I have only seen positive aspects. If there are any questions or concerns about my relationship with Rene Cardona, please feel free to contact me at your earliest convenience at the number listed below.

Cordially,

Andre Jesshua Chavez


Andre Chavez

Bronx, NY, 10459

Signature:

June 7, 2015

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
Foley Square
New York, New York 10007


Dear Judge Abrams:

My name is Narcisa Ortiz and I am a friend of Rene Cardona. We became friends at the Iglesia Evangelica Pentecostal Sion Inc. I have known Rene for two years. During my attendance at church, I have seen Rene and his mother worshiping the Lord faithfully. Rene and I held conversations about his future plans such as going back to school. Rene is a person who won't hesitate to help if asked a favor. He is very respectful with his elders and friends.  He always listens and respects his mother. If there are any questions or concerns about my relationship with Rene Cardona. Please feel free to contact me at your earliest convenience at the number listed below.

Sincerely yours,

Narcisa Ortiz



██████████████████
Bronx, New York 10459
████████████

Signature: _____



## Zion Empowerment Ministry

**OFFICE**
666 Union Avenue
Bronx, NY 10455

**PHONE**
718-612-9181

**FAX**
646-563-9505

**EMAIL**
Zionempowermentministry@gmail.com

June 30, 2015

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York  10007

**Re: Rene Cardona**

Dear Judge Abrams:

My name is Rev. Daniel Ferrer and I've known Rene Cardona for the past three years.  I am an ordained minister through an Evangelical Denomination and recognized by the State of New York as such and as a marriage officiant.  I am also Overseer of Zion Empowerment Ministry, which is the English Ministry and Services of Iglesia Evangelica Pentecostal Sion (Zion Evangelical Pentecostal Church) located at Bronx, NY.

During the past three years, I've known Rene to be a respectable young man with a heart of gold.  He always exhibited a humble disposition and sought out opportunities to help within the ministry.  He is a talented young man with excellent musical skills.  He has a powerful voice that he used to lead worship in the church and plays the keyboard well.  Rene was very helpful to our ministry, as a musician, and was very responsible.  He also displayed a great attitude and carried a positive temperament when dealing with the people in our ministry.  Additionally, Rene has helped with Outreach initiatives that we've conducted in our community by encouraging people with his songs.

Rene spoke to me several times about his desire to pursue his college studies.  I know that he has been through many challenging moments in his life and has suffered lost in his family (Father, Brother).  However, he always displayed a bright outlook in life that was contagious and shared often that his strong faith was an element in his determination to get ahead.

I am knowledgeable of the crime Rene committed and understand from the communications I've had with Rene that he regrets his actions.  I try to encourage him by speaking to him about forgiveness – that he should ask God for forgiveness and pray that those he hurt may forgive him as well. Also, I share with him that he should try to forgive himself too and press forward in life - doing everything he can to live out a life of integrity and doing good to his fellowman.

I am hopeful that he has learned from his grave mistakes and that he has the will power to rehabilitate completely; in order to be productive in life and do much good with all the great potential God has placed in him.

Thank you for considering these few sentences.  If you need further information, please feel free to reach out to me at 718-612-9181.

Sincerely,

Rev. Daniel Ferrer
*Ordained Minister*

# EXHIBIT "C"

Prison Is 'Living Hell' for Pedophiles



# Prison Is 'Living Hell' for Pedophiles

Some Prisoners May See 'Taking Out' Child Molesters as Way to Build Reputation

By MICHAEL S. JAMES

**Aug. 26, 2003 —**

In prison, fellow inmates derisively call pedophiles "chesters," "tree jumpers" and "short eyes."

Prison can be a menacing place for child molesters like the former Roman Catholic priest John Geoghan, who was killed in his cell Saturday ??? or for other alleged pedophile priests working their way through the criminal justice system.

"If you take out a sex offender like this former priest in Massachusetts, maybe the person who took him out thought he'd make a name of himself," said Margot Bach, a spokeswoman for California Department of Corrections. "Taking [a pedophile] out would gain [the killer] a lot more respect among the other inmates."

In fact, Goeghan's accused killer, Joseph Druce, "looked upon Father Geoghan as a prize," and plotted his killing for a month, John Conte, district attorney for Worcester County, Mass., told reporters Monday.

Though prison officials in some Northeastern states question the idea of an automatic social hierarchy among prisoners based solely upon their offenses, most agree that if there is one, child molesters and informants ??? derided as "snitches" ??? occupy the lowest rungs.

**???They Usually Don???t Make It???**

Such offenders, including Geoghan, often are placed into protective custody with other prisoners seen to be under a threat.

"Once their crime has become known, they usually don't make it" without protective custody, said Lt. Ken Lewis, a corrections officer and spokesman at California's Los Angeles County State Prison. "There's a lot of [pedophiles] that can successfully make it ??? as long as they don't brag about their offense."

If they do talk, "they'll get beat up," Lewis added. "In some places he may even get his throat cut."

That potentially could mean a lot of inmates at risk. At the end of 2001, about 83,000 state prison inmates, or about 6.8 percent, were male sex offenders who had committed a rape or sexual assault against a minor under age 18, according to Allen Beck, chief of corrections statistics for the federal Bureau of Justice Statistics.

Just 56 state and federal prisoners out of a population of about 1.3 million were actually killed by other inmates during the yearlong period between July 1999 and June 2000, and it was unknown how many were pedophiles, Beck said.

But unpopular prisoners also can be harassed in other ways.

"[Child sex offenders] are at risk of being murdered, having their food taken, having their cells defecated and urinated in," said Leslie Walker, a prisoner's rights activist with the Massachusetts Correctional Legal Society. "Their life is truly a living hell."

### ???Who???s Running This??? Prison?

Part of the reason pedophiles can be so reviled is that some inmates are parents, and many were themselves sexually abused as children, some say. Druce's father told The Boston Herald that Druce frequently had been molested.

Some reports have described Druce, 37, as a member of the neo-Nazi hate group Aryan Nation. In particular, Druce ??? who is serving a life sentence for killing a gay man who picked him up as a hitchhiker in 1988 ??? "has a long-standing phobia, it appears, towards homosexuals of any kind," Conte said.

With such a background, critics ??? including Walker and Kazi Toure, an ex-convict and prisoner support worker who still visits Massachusetts prisons ??? are asking how Druce could have been placed in protective custody so near to the frail, 68-year-old Geoghan at the maximum-security Souza-Baranowski Correctional Center in Shirley, Mass.

Walker cited "a culture of looking the other way in prison." Toure, co-director of the American Friends Service Committee's Criminal Justice Program in Cambridge, Mass., said he, too, was suspicious.

"For this guy who is in prison for killing a gay person ??? he's seeing Geoghan every day, so this stuff has got to be coming up inside of him," Toure said. "We're spending all this money [on high-tech prisons], and the guy got killed, and they want to blame it on the crazy guy? Who's running this?"

Michael Shively, a former Massachusetts corrections official, said even though Geoghan was in protective custody, it was impossible to completely guarantee his safety given that the other inmates who require protection are drawn from a difficult and dangerous population.

"To put together a group of people where it looks like no offender is a threat to another offender is almost impossible when you're drawing from that pool," Shively said.

### Local Variations

The pool of prisoners in protective custody can vary from state to state, and does not automatically include all child molesters and informants, officials and aid workers said.

California prison officials described a good deal of racial and gang affiliation among that state's prison population and a crime-based hierarchy among inmates ??? with certain murderers at the top of the heap.

Ironically, they said killing someone either at the top or the bottom of the totem pole will garner respect for the killer among fellow inmates ??? so child molesters and high-profile killers both tend to be given protective custody unless they're deemed tough or discreet enough to get along in the general population.

But things are different in other parts of the country, said Ed Ramsey, a spokesman for the Connecticut Department of Corrections, and a former corrections officer at a maximum-security prison in the state.

Ramsey does not see a clearly defined "hierarchy of crimes" among Connecticut inmates, nor large amounts of self-segregation along gang and racial lines. Therefore, he said, the state evaluates candidates for protective custody on a case-by-case basis ??? considering those who legitimately feel endangered, or who the institution sees as potential targets and therefore threats to maintaining order. Such targets might include inmates in high-profile cases or jailed former law enforcement officers.

In a further effort to maintain order, Connecticut officials do segregate suspected members of certain gangs, including the Aryan Brotherhood, within the prison system, Ramsey said.

Toure said although Massachusetts inmates may mock or scorn pedophiles, he does not see a strict hierarchy of crimes in the state's prisons that would lead to violence.

"I left Walpole [a maximum-security prison in Massachusetts] in '87 and there wasn't a P.C. [protective custody] unit anymore ??? because that stuff wasn't happening anymore, because people weren't killing other people because of sex offenders or anything like that," he said. "It had died down."

But Toure said hate can fuel violence if it festers, and as prison services for inmates are cut due to budget constraints, inmates with personal issues can lash out at others who personify their problems. He said the Geoghan killing might be a case in point.

"They don't give [Druce] any counseling or any programs to help him deal with any problems that brought him in prison," Toure claimed. "Then, they put him in protective custody ??? with John Geoghan, who's in jail for child molestation."

*ABCNEWS' Dan Harris contributed to this report.*

Copyright © 2015 ABC News Internet Ventures

# EXHIBIT "D"



RESEARCH SERIES ON THE RECIDIVISM OF
FEDERAL GUIDELINE OFFENDERS

RELEASE 1

# MEASURING RECIDIVISM:
# THE CRIMINAL HISTORY COMPUTATION
# OF THE FEDERAL SENTENCING GUIDELINES

A COMPONENT OF THE
FIFTEEN YEAR REPORT
ON THE U.S. SENTENCING COMMISSION'S
LEGISLATIVE MANDATE



May 2004

### 2.  Age at Sentence

Recidivism rates decline relatively consistently as age increases.  Generally, the younger the offender, the more likely the offender recidivates.  Exhibit 9 illustrates the age recidivism trend of the study sample.  Among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent.

### 3. Race and Ethnicity

Exhibit 9 illustrates that the race of the offender is associated with recidivism rates.  Overall, Black offenders are more likely to recidivate (32.8%) than are Hispanic offenders (24.3%).  White offenders are the least likely to recidivate (16.0%).

### 4. Employment Status

Exhibit 10 shows that those with stable employment in the year prior to their instant offense are less likely to recidivate (19.6%) than are those who are unemployed (32.4%).  The difference between the employed and unemployed recidivating declines in the higher CHCs, until offenders in CHC VI have virtually the same recidivism rate regardless of their employment status in the year prior to their instant offense.

### 5. Educational Attainment

Exhibit 10 shows recidivism rates for offenders with different educational backgrounds.  Overall, offenders with less than a high school education are most likely to recidivate (31.4%), followed by offenders with a high school education (19.3%), offenders with some college education (18.0%), and offenders with college degrees ( 8.8%).  One exception is seen in CHC V where recidivism rates for offenders with a college education (73.3%) are higher than rates for offenders with less than a high school education (50.6%).

### 6. Marital Status

Offenders who have never been married are most likely to recidivate (32.3%), as shown in Exhibit 10.  Those who are married are slightly less likely to recidivate (13.8%) than are those who are divorced (19.5%).

Exhibit 9

## Primary Definition Recidivism Rates[1] for General Demographic Variables, by Criminal History Category Gender, Age at Sentencing, and Race

Recidivism Study 2003

### CRIMINAL HISTORY CATEGORIES

| Demographic Characteristics | Total Percent Recidivating | Category I Percent Recidivating | Category II Percent Recidivating | Category III Percent Recidivating | Category IV Percent Recidivating | Category V Percent Recidivating | Category VI Percent Recidivating |
|---|---|---|---|---|---|---|---|
| TOTAL[2] 24,335 | 24,335 | 15,429 | 2,857 | 2,844 | 1,359 | 779 | 1,067 |
| **Gender** | | | | | | | |
| Female | 13.7 | 10.0 | 23.6 | 30.7 | 40.0 | 36.8 | 39.0 |
| Male | 24.3 | 15.2 | 24.1 | 34.7 | 45.0 | 52.8 | 56.3 |
| **Age at Sentence** | | | | | | | |
| Under 21 | 35.5 | 29.5 | 35.6 | 54.7 | 64.3 | 60.1 | 55.0 |
| 21 – 25 | 31.9 | 22.3 | 29.1 | 42.7 | 55.1 | 70.1 | 68.1 |
| 26 – 30 | 23.7 | 13.3 | 27.3 | 33.6 | 43.9 | 53.1 | 58.8 |
| 31 – 35 | 23.8 | 14.6 | 22.7 | 32.7 | 42.7 | 50.8 | 59.3 |
| 36 to 40 | 19.7 | 12.1 | 23.2 | 29.4 | 33.1 | 40.0 | 51.3 |
| 41 to 50 | 12.7 | 6.9 | 13.3 | 24.5 | 45.3 | 35.7 | 41.3 |
| Over 50 | 9.5 | 6.2 | 13.9 | 19.8 | 21.0 | 57.1 | 41.1 |
| **Race** | | | | | | | |
| White | 16.0 | 8.9 | 18.9 | 27.8 | 42.8 | 46.8 50.9 | 57.8 |
| Hispanic | 24.3 | 18.9 | 22.9 | 36.0 | 28.1 | 47.0 | 60.7 |
| Black | 32.8 | 23.7 | 31.4 | 41.6 | 48.0 | 55.6 | 57.1 |
| Other[3] | 26.4 | 15.5 | 35.9 | 58.3 | 39.6 | *100.0‡* | |

[1] Primary recidivism definition based on offender's re-arrest, including supervised release/ probation violations, re-arrest, or re-conviction.
[2] Number of offenders with a 24 month period at risk of recidivating following either initiation of probation (for offenders receiving probation-only sentences) or release from confinement (for those offenders receiving confinement sentences).
[3] "Other" race category includes Native Americans and Asians.
‡ Indicates fewer than 10 sample subjects. Findings may not be statistically significant.
SOURCE: U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.

# EXHIBIT "E"

# FEDERAL CHILD PORNOGRAPHY OFFENSES



**Patti B. Saris**
*Chair*

**William B. Carr, Jr.**
*Vice Chair*

**Ketanji B. Jackson**
*Vice Chair*

**Ricardo H. Hinojosa**
*Commissioner*

**Beryl A. Howell**
*Commissioner*

**Dabney L. Friedrich**
*Commissioner*

**Jonathan J. Wroblewski**
*Commissioner, Ex-officio*

**Isaac Fulwood, Jr.**
*Commissioner, Ex-officio*

Sentencing data suggest that judges who impose lifetime terms of supervision in non-production cases do so in part in response to an offender's history of criminal sexually dangerous behavior ("CSDB").[26]  Fiscal year 2010 non-production cases in which offenders received a lifetime term of supervision had a significantly higher rate of CSDB than cases in which offenders received less than lifetime terms (48.1% compared to 28.4%), as shown in Figure 10–3 below.



**Figure 10-3**
**Non-Production Offense Characteristics:**
**CSDB by Lifetime and Non-Lifetime Supervision**
**Fiscal Year 2010**

SOURCE: U.S. Sentencing Commission, 2010 Datafile, USSCFY10.  Of the 590 cases, twenty-four cases excluded in which a prison term was not ordered.

**B.   EVALUATION AND TREATMENT OF CHILD PORNOGRAPHY OFFENDERS' SEXUAL DISORDERS**

Psycho-sexual treatment is a recommended condition of supervision for all child pornography offenders.[27]  Many offenders also receive treatment in federal prison before being released on supervision.  This section first describes the psychological evaluation and treatment of child pornography offenders.  It next specifically addresses the closely related topic of risk assessment of offenders.

---

[26]  Criminal sexually dangerous behavior is discussed in Chapter 7.

[27]  *See* USSG §5D1.3(d)(7)(A) (special condition of supervised release for sex offenders, including all child pornography offenders, requires "the defendant to participate in a program . . . for the treatment and monitoring of sex offenders").

*United States Sentencing Commission*

1.                    *Treatment Generally*

According to many experts, the typical sex offender who presents with a sexual disorder, including pedophilia, cannot be "cured" (*i.e.*, his psychiatric disorder cannot be entirely eradicated).[28]  However, according to the Center for Sex Offender Management ("CSOM"), a project funded by the United States Department of Justice, Office of Justice Programs,[29] some recent studies show that appropriate "treatment interventions . . . are associated with lower rates of recidivism — some of them very significant."[30]  For that reason, "treatment is an essential component of a comprehensive sex offender management system."[31]

Experts disagree about how to measure the effectiveness of treatment programs.  Debates have ensued about such issues as the metric used (recidivism versus changes in sexually deviant beliefs), the proper sample size, whether treatment alone (as opposed to treatment in conjunction

---

[28]  *See, e.g.*, William Marshall, *Appraising Treatment Outcomes with Sexual Offenders*, in SEXUAL OFFENDER TREATMENT 268 (W. Marshall et al., eds., 2006) (stating that sex offender "treatment [can] reduce, but unfortunately not eliminate, the number of future victims"); Belinda Brooks-Gordon, *Psychological Interventions for Treatment of Adult Sex Offenders:  Treatment Can Reduce Reoffending Rates but Does not Provide a Cure*, 333 BMJ [formerly known as BRITISH MEDICAL JOURNAL] 5 (2006); U.S. DEPT. OF JUSTICE, NAT'L INSTITUTE OF CORRECTIONS, QUESTIONS AND ANSWERS ON ISSUES RELATED TO THE INCARCERATED MALE SEX OFFENDER 5–6 (Oct. 1988), (available at http://static nicic.gov/Library/007404.pdf) (stating that "[s]ex offenders are not cured" but noting that "[s]ome, but not all, sex offenders can be treated successfully").  One possible exception to the general rule that sexual disorders cannot be cured involves rare offenders whose sexual disorders are related to a physical abnormality in their brains that can be permanently altered through medical treatment.  These rare offenders do appear capable of being "cured."  *See, e.g.*, David Eagleton (a professor of neuroscience at Baylor College of Medicine), *The Brain on Trial*, THE ATLANTIC (July 2011) (recounting the case of a man who, at the age of 40, first began to collect child pornography and engage in child molestation but who permanently discontinued such sexual deviancy after surgical removal of "massive tumor in his orbitofrontal cortex").

[29]  The CSOM is a federally-funded private entity jointly created in 1996 by DOJ's Office of Justice Programs, the National Institute of Corrections, and the State Justice Institute.  Its mission includes providing "useful, current, and accessible information" to government officials and private treatment providers who manage sex offenders.  *See* "About CSOM," http://www.csom.org/about/about html (last visited Oct. 26, 2012).

[30]  CSOM, *Sex Offender Treatment in the Context of Supervision*:  *Effectiveness of Sex Offender Treatment ("Review of the Research")*, http://www.csom.org/train/supervision/long/04_02_02 html (last visited Oct. 26, 2012) (discussing several studies of the effectiveness of treatment of sex offenders); *see also* U.K. MINISTRY OF JUSTICE NAT'L OFFENDER MANAGEMENT SERVICE, WHAT WORKS WITH SEX OFFENDERS? 1 (2010) ("Large-scale research indicates that sex offenders who receive treatment, in both prison and community settings, have a lower sexual reconviction rate than those who do not receive treatment."); R. Karl Hanson et al., *The Principles of Effective Correctional Treatment Also Apply to Sexual Offenders:  A Meta-Analysis*, 36 CRIM. JUST. & BEHAV. 865 (2009) (meta-analysis of studies on the efficacy of sex offender treatment programs; finding that the unweighted mean recidivism rate for the treatment group was almost half of that for sex offenders not treated); PEGGY HEIL & KIM ENGLISH, CAL. DEP'T OF CORR. AND REHAB., PRISON SEX OFFENDER TREATMENT: RECOMMENDATIONS FOR PROGRAM IMPLEMENTATION 1 (2007) ("While the efficacy of sex offender treatment remains a debated topic, many studies show that treatment participation is correlated with lower officially recorded recidivism rates.") (citing numerous recidivism studies).  Some experts believe that sex offenders who are psychopaths will not respond favorably to treatment.  *See, e.g.*, Michael Seto & H.E. Barbaree, *Psychopathy, Treatment Behavior, and Sexual Offender Recidivism*, 14 J. INTERPERSONAL VIOLENCE 1235 (1999).

[31]  CSOM, *The Comprehensive Approach to Sex Offender Management*, at 5 (Nov. 2008), http://www.csom.org/pubs/Comp_Approach_Brief.pdf (last visited Oct. 26, 2012).

with other factors) reduces recidivism, and what conclusions may be drawn given the low base rate of *known* — versus actual — recidivism generally.[32]

Treatment of sex offenders, including child pornography offenders, has several goals. The larger goal is preventing recidivism, including sexual recidivism (*i.e.*, the commission of a new sex offense, including a new child pornography offense).  Subsidiary treatment goals include addressing criminogenic needs, reducing or eliminating distorted beliefs about sexuality, fostering acceptance of responsibility by offenders, and developing empathy for victims.[33] Experts in the field agree that effective treatment requires individualized assessment and treatment.[34]

Generally speaking, the prevailing mode of treatment for child pornography offenders does not appear to differ significantly from the treatment of other types of sex offenders, including offenders convicted solely of "contact" sex offenders.  Some "[m]odifications . . . have been implemented that consider the role that the [I]nternet plays in the [child pornography] offense process."[35]  In particular, effective treatment of child pornography offenders typically must address problematic Internet use such as compulsion or an offender's involvement, if any, in Internet-based sexually deviant "communities" of other offenders.[36]

In order to design appropriate treatment, clinicians typically first administer a psychosexual evaluation to determine: amenability to treatment; recommended types and intensity of treatment; level of risk for sexual and non-sexual recidivism; and level of criminal justice supervision required.[37]  A complete psychosexual evaluation will typically include a

---

[32]  *See e.g.*, David K. Ho & Callum C. Ross, *Editorial: Cognitive Behaviour Therapy for Sex Offenders. Too Good to be True?* 22 CRIM. BEHAV. & MENTAL HEALTH 1 (2012); Kevin L. Nunes, Kelly M. Babchishin & Franca Cortoni, *Measuring Treatment Change in Sex Offenders*, 38 CRIM. JUST. & BEHAV. 157 (2011) (contending that individuals show only "modest" positive change after treatment).

[33]  *See, e.g.,* CSOM, *Comprehensive Approach to Sex Offender Management*, *supra* note 31, at 5; Kevin L. Nunes, Kelly M. Babchishin & Franca Cortoni, *Measuring Treatment Change in Sex Offenders*, 38 CRIM. JUST. & BEHAV. 157 (2011); Leigh Harkins & Anthony R. Beech, *A Review of the Factors that Can Influence the Effectiveness of Sexual Offender Treatment:  Risk, Need, Responsivity & Process Issues*, 12 AGGRESSION & VIOLENT BEHAV. 615, 618–19 (2007) (discussing different treatment goals including, *inter alia*, confronting and changing distorted attitudes about sexuality, promoting healthy social functioning, and preventing recidivism).

[34]  *See* Harkins & Beech, *supra* note 33, at 616; Testimony of Dr. Jennifer A. McCarthy, Assistant Director and Coordinator, Sex Offender Treatment Program, New York Center for Neuropsychology, to the Commission, at 113 (Feb. 15, 2012) ("McCarthy Testimony").

[35]  Prepared Statement of Dr. Jennifer McCarthy to the Commission, at 5–6 (Feb. 15, 2012) ("McCarthy Statement").

[36]  *Id.*  Implementation of treatment regimes tailored to child pornography offenders — called "i-SOTP" (short for "Internet Sex Offender Treatment Programs") — first occurred in the United Kingdom in 2006.  *See* David Middleton, *From Research to Practice:  The Development of the Internet Sex Offender Treatment Programme (i-SOTP)*, 5 IRISH PROBATION J.49 (2008).  Results of a preliminary study concerning the effectiveness of the i-SOTP "appear[] to be sufficiently encouraging," although a long-term study of the effectiveness of the program will require more time to pass.  David Middleton et al., *Does Treatment Work with Internet Sex Offenders? Emerging Findings from the Internet Sex Offender Treatment Program (I SOTP)*, 15 J. SEXUAL AGGRESSION 5, 17 (2009).

[37]  CSOM, *Comprehensive Approach to Sex Offender Management: Clinical Assessments*, *supra* note 31, at 4–5.

clinical interview during which a thorough history is taken including the offender's sexual history (interests, behaviors, and sexual partners), the history of any physical or sexual abuse inflicted on the offender, substance abuse history, and mental health and medical history.[38]  The evaluation may include a personality assessment[39] and risk assessment.[40]

One factor of particular interest in creating a treatment plan is an offender's deviant sexual attitudes, especially attitudes toward children.  Cognitive distortions appear to play a significant part in offenders' interest in child pornography and also some offenders' proclivities to commit sexual contact offenses against children.[41]  The clinical interview thus often will include discussion of the offender's sexual interests and beliefs regarding children.  However, the evaluator often also typically will rely on non-verbal tests to determine whether an offender has pedophilic, hebephilic, or other paraphilic interests,[42] because offenders tend to minimize their behavior or deny deviant thoughts.[43]  Two common such assessments are penile phallometric tests ("PPT") (which measure physical arousal to sexual stimuli) and visual response time (VRT) tests (which measure visual response to images of persons from different genders and age groups).[44]

According to experts, "[t]here is a variety of accepted treatment and behavior management programs" for sex offenders.[45]  Sex offenders, including child pornography offenders, are most commonly treated with cognitive behavioral therapy (CBT),[46] often involving

---

[38]  McCarthy Testimony, *supra* note 34, at 109.

[39]  *Id.*

[40]  Risk assessment is discussed in Section B.3., *infra.*

[41]  *See* Martin C. Calder, *The Internet:  Potential, Problems, and Pathways to Hands-on Sexual Offending in* CHILD SEXUAL ABUSE & THE INTERNET: TACKLING THE NEW FRONTIER 2 (Martin C.. Calder ed., 2004); Ethel Quayle & Max Taylor, *Child Pornography and the Internet:  Perpetuating a Cycle of Abuse*, 23 DEVIANT BEHAV. 331 (2002).

[42]  McCarthy Testimony, *supra* note 34, at 109.

[43]  *Id.* at 150; *see also* Theresa A. Gannon, Kirsten Keown & Devon L.L. Polaschek, *Increasing Honest Responding on Cognitive Distortions in Child Molesters:  The Bogus Pipeline Revisited*, 19 SEX ABUSE 5, 5–6 (2007).

[44]  The PPT will typically expose the subject to different images and measure the change in bloodflow based on the type of image.  *See* FABIAN M. SALEH et al., SEX OFFENDERS: IDENTIFICATION, RISK ASSESSMENT, TREATMENT, AND LEGAL ISSUES 89–118 (Oxford 2009); MANAGING ADULT SEX OFFENDERS: A CONTAINMENT APPROACH 14–3 (Kim English et al*.,* eds. 1996); Gene Abel et al*.*, *Classification Models of Child Molesters Utilizing the Abel Assessment for Sexual Interest*, 25 CHILD ABUSE & NEGLECT 703 (2001).

[45]  Association for the Treatment of Sexual Abusers (ATSA), *Sex Offender Treatment for Adult Males* 1 (2008), http://atsa.com/sites/default/files/ppSOAdultMaleTx.pdf (last visited Dec. 20, 2012).

[46]  Testimony of Dr. Gene A. Abel, Medical Director, Behavioral Medicine Institute, to the Commission, at 92 (Feb. 15, 2012) ("Abel Testimony"); McCarthy Testimony, *supra* note 34, at 113; *see also* COSM, *Sex Offender Specific Treatment in the Context of Supervision*, *supra* note 30 (finding that "[c]ognitive-behavioral approaches appear most promising" as a mode of sex offender treatment).  A related form of treatment is referred to as "psycho-educational" therapy.  Psycho-educational techniques "focus[] on increasing offenders' empathy for the victim while also teaching them to take responsibility for their sexual offenses."  *See* U.S. Dept. of Justice, Office of Justice Programs (Bureau of Justice Assistance), *What Are Sex Offender Programs/Strategies?*  https://www.bja.gov/evaluation/program-corrections/sops1.htm (last visited Dec. 20, 2012).

both individual and group therapy.[47]  CBT combines elements of behavioral therapy, which focuses on external offender behaviors, with cognitive therapy, which focuses on internal thought processes.[48]  The individualized CBT for child pornography offenders relies on, among other things, an offender's motivations for using child pornography, sexual interests, participation in an online community of offenders, and predilection for contact offenses or other sexually dangerous behavior. If a mental health provider were able to access and review the offender's previous child pornography collection or, at a minimum, a forensic report regarding the collection, the provider's ability to develop a more finely tailored program of treatment would be enhanced.[49]  According to some clinical practitioners, CBT in conjunction with additional relapse prevention support, including polygraph testing (discussed further below), appears to be effective for most child pornography offenders.[50]  In addition to CBT, treating psychiatrists also may prescribe medication (*i.e.,* serotonin-specific reuptake inhibitor drugs or, in some cases, anti-androgenic medication).[51]

Experts believe that the appropriate duration of treatment, including follow-up "maintenance" to prevent relapse, "depends on a variety of factors, including the program or practitioner's approach and the offender's characteristics, offense patterns, level of risk to recidivate, and community support."[52]  Dr. Gene Abel, M.D., a psychiatric expert on sex offenders who testified before the Commission at its 2012 public hearing on child pornography offenses, recommended a period of treatment and follow-up "maintenance" ranging from five to ten years for the typical non-production offender.[53]  For some offenders, he opined, life-time maintenance is required.[54]

---

[47]  *See* Michael Knapp, *Treatment of Sex Offenders* 13–5, *in* MANAGING ADULT SEX OFFENDERS:  A CONTAINMENT APPROACH (Kim English et al., eds., 1996) ("Group therapy provides the best format for confronting ongoing denial [by offenders], increasing an offender's acceptance of deviance, and maximizing accountability. . . .  For sex offenders, individual therapy cannot begin to match the effectiveness of group therapy.").

[48]  Harvey Milkman & Kenneth Wanberg, *Cognitive-Behavioral Treatment:  A Review & Discussion for Corrections Professionals,* NAT'L INST. OF CORR., at xii  (2007).

[49]  McCarthy Testimony, *supra* note 34, at 122–24 (testifying that, "if we have information from the [forensics] report to say this guy focused primarily on images that were depicting minors under  the age of 12, that's extremely valuable information  with regard to treatment").  However, according to Dr. McCarthy, treatment providers today do not typically have access to information about the nature of an offender's child pornography collection (other than a general description of the specific images for which he was convicted).  *See id.* at 122–24.

[50]  *See, e.g.,* Abel, Testimony, *supra* note 46, at 92–93 ("How effective is that treatment?  It's quite effective.  Treating adults, 93 to 95 percent success if [official supervision] is involved, and if polygraphs are done every six months, and if cognitive behavioral treatment is used.").

[51]  D.M. Greenberg & J.M.W. Bradford, *Treatment of the Paraphilic Disorders:  A Review of the Role of the Selective Serotonin Reuptake Inhibitors*, 9 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 349 (1997); D.J. Stein et al., *Serotonergic Medications for Sexual Obsessions, Sexual Additions and Paraphilias*, 53 J. CLINICAL PSYCHIATRY 267 (1992); Barry M. Maletzky et al., *The Oregon Depo-Provera Program:  A Five-Year Follow-Up*, 18 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 303 (2006); *see also* McCarthy Testimony, *supra* note 34, at 116 (testifying that occasionally "psychopharmacology may be used" in treatment but is not common "because there's a lot of side effects to this medication").

[52]  ATSA, *Sex Offender Treatment for Adult Males*, *supra* note 45, at 1.

[53]  *See* Abel Testimony, *supra* note 46, at 136–37 (recommending at least five to ten years of treatment, including "maintenance," for the typical child pornography offender).  Dr. Abel opined that CBT usually is successfully

Polygraph testing of sex offenders is widely accepted by experts as a critically important corollary to effective treatment.  In this context, polygraph testing is not intended to develop incriminating evidence, but instead is used as a "truth facilitator" for sex offenders to accomplish the goals of treatment.[55]  "Like urinalysis testing with drug offenders, the polygraph examination is a tool to gauge [a sex] offender's progress and compliance with treatment and supervision expectations."[56]  According to senior federal probation officers with expertise in supervising sex offenders:  "Polygraph exams may be used to aid supervision and treatment, and officers may discuss the polygraph results with the treatment provider and the offender.  Frequently, the offender will admit to violations [of the conditions of supervision] before the polygraph is administered."[57]  Use of polygraphs in sex offender treatment has been recommended by the Association for the Treatment of Sexual Abusers.[58]

2.        *Treatment in Prison and on Supervision*

Treatment of child pornography offenders may occur while they are in federal prison and, as noted above, is a standard condition of their supervision (on probation or supervised release).

a.        Treatment While in Prison

The Federal Bureau of Prisons ("BOP") has comprehensive sex offender management strategy, including for offenders serving sentences for child pornography offenses.  According to the BOP:

> With the passage of the Walsh Act [in 2006[59]], the BOP has further expanded its monitoring, evaluation, and treatment programs for sex offenders.  As required by the Walsh Act, a specialized sex offender program is offered in each BOP region.  Inmates with a history of sexual offenses may be designated to the Sex Offender Management Program (SOMP), at one of six institutions:  FMC Devens; United States

---

implemented with "120 contacts" between an offender and treatment provider.  *Id.* at 136.  He further opined that "maintenance [should be] really long, and the maintenance is just as important as the treatment . . . .  [W]hatever treatment you have, it doesn't count unless it's maintained over time." *Id.*

54  *See id.* at 137.

55  Jami Krueger, *The Use of the Polygraph in Sex Offender Management*, RESEARCH BULLETIN 3, at 12 (N.Y. State Div. of Probation and Correctional Alternatives), http://nicic.gov/Library/023570 (last visited Dec. 20, 2012); *see also* Kim English et al., *The Value of Polygraph Testing in Sex Offender Management: Research Report Submitted to the National Institute of Justice* (December 2000), https://www.ncjrs.gov/pdffiles1/nij/grants/199673.pdf; *see also* McCarthy Testimony, *supra* note 34, at 117–22 (Feb. 15, 2012) (testifying about the effective use of polygraphs in treatment); Abel Testimony, *supra* note 46, at 132 (opining that, while "polygraphs are not perfect," they are "exceedingly useful" in the treatment of such offenders because the typical offender in treatment tends to be dishonest about his sexual preferences and/or sexual history with children).

56  HEIL & ENGLISH, *supra* note 30, at 30.

57  Adam Graves & Mike Jones, *The Containment Model and its Impact on Sex Offender Policy*, 36 NEWS & VIEWS [newsletter of U.S. Probation and Pretrial System] 8 (Aug. 1, 2011).

58  English et al., supra note 47, at 15–3.

59  The Adam Walsh Act is discussed at *infra* note 100 and accompanying text.

Penitentiary (USP) Marion; USP Tucson; Federal Correctional Institution (FCI) Seagoville; FCI Petersburg; and FCI Marianna.  Assignment is made in accordance with the security level of the individual.  An inmate amenable to treatment is offered participation in the Sex Offender Treatment Program (SOTP-NR) offered at all SOMP institutions.  SOTP-NR offers inmates individualized nonresidential treatment, ordinarily involving six to eight hours of programming per week, over a six month period.  All participation in non-residential treatment services is voluntary.[60]

BOP also has a "residential" treatment program for sex offenders (including child pornography offenders):

Inmates at any BOP institution may choose to volunteer for an intensive residential sex offender treatment program (SOTP-R) offered at FMC Devens.  The BOP reviews each application for the SOTP-R, considering such factors as the seriousness of the inmate's sexual offending history, the inmate's disciplinary record, and the amount of time remaining on the inmate's sentence.  The SOTP-R is a therapeutic community, housed in a 112-bed specialized unit.  The program employs a wide range of cognitive-behavioral and relapse prevention techniques to help the sex offender manage his sexual deviance both within the institution and in preparation for release.  Ordinarily, participants complete the program in 12 to 18 months.[61]

b.      The "Containment Model":  Treatment of Offenders on Supervision

It is widely accepted among treatment providers that "prison treatment will be more effective if it is followed by community-based containment services, including supervision, treatment, and polygraph testing."[62]  Like many of their counterparts in the state parole and probation systems, federal probation officers currently implement what is known as the "containment model" of supervision of sex offenders, including child pornography offenders, on federal probation or supervised release.[63]  The containment model is based on the close cooperation of the supervising officer, a mental health treatment provider, and a polygraph

---

[60]  *See* BOP, *Legal Resource Guide to the Federal Bureau of Prisons* 28–29 (2008), http://www.bop.gov/news/PDFs/legal_guide.pdf. (last visited Dec. 12, 2012).

[61]  *Id.* at 29; *see also* Kathleen Horvatits, *Sex Offender Treatment Programs at the Federal Bureau of Prisons* 36 NEWS & VIEWS [newsletter of U.S. Probation and Pretrial System] 4 (Aug. 1, 2011).

[62]  HEIL & ENGLISH, *supra* note 30, at 1.

[63]  *See* Graves & Jones, *supra* note 57, at 8 ("In the supervision of sex offenders, our system has relied on [the book,] *Managing Adult Sex Offenders:  A Containment Approach* [(Kim English et al., eds., 1996)].  Since the book's release in 1996, it has steadily become respected system-wide as the blueprint for the community supervision of sex offenders.").

*United States Sentencing Commission*

examiner.[64] Kim English, one of the leading developers of the containment model, has described it in the following manner:

> The containment approach operates in the context of multi-agency collaboration, explicit policies, and consistent practices that combine case evaluation and risk assessment, sex offender treatment, and intense community surveillance, all designed specifically to maximize public safety. . . .  There are three anchors in containment-focused risk management:  (1) supervision, (2) therapy, and (3) polygraph examinations.  Each benefits from the distinct function of the others.  The criminal justice supervision activity is informed and improved by the information obtained in sex-offender-specific therapy, and therapy is informed and improved by the information obtained during well-conducted post-conviction polygraph examinations.  Each anchor must be perceived by the offender as separate yet aligned with the other.[65]

According to the Center for Sex Offender Management, "[a]gencies that have moved to a Containment Approach are hopeful that the combination of these three resources will prove significantly effective in reducing re-offense rates."[66]  The CSOM also has noted "promising results" of a recent study of the efficacy of sex offender treatment in the specific context of the containment model.[67]  It is widely accepted that the containment model has become a "best practice" to be implemented in supervising sex offenders in both the federal system and many state systems.[68]

---

[64]  *Id.*; *see also* MANAGING ADULT SEX OFFENDERS:  A CONTAINMENT APPROACH, *supra* note 47, at 2–5–2–6, 2–10–2–12 (discussing the "containment approach," which "seeks to hold sex offenders accountable through the combined use of both the offenders' internal controls and external controls through criminal justice control measures, and the use of the polygraph to monitor internal controls and compliance with external controls").

[65]  Kim English, *The Containment Approach to Managing Sex Offenders*, 34 SETON HALL L. REV. 1255, 1257, 1262 (2004).

[66]  CSOM, *Sex Offender Treatment in the Context of Supervision*: *Effectiveness of Sex Offender Treatment*, *supra* note 30.

[67]  *Id.*; *see also* SEXUAL DEVIANCE: THEORY, ASSESSMENT, AND TREATMENT 542 (Laws & O'Donohue eds., 2d ed. 2008) (likewise noting "promising results" from studies of the effectiveness of psycho-sexual treatment in the specific context of the containment model).

[68]  *See* Graves & Jones, *supra* note 57, at 8 (noting that, since the mid-1990s, the containment model "has steadily become respected system-wide as the blueprint for the community supervision of sex offenders"); Roger Pimentel & Jon Muller, *The Containment Approach to Managing Defendants Charged With Sex Offenses*, 74 FED. PROB. 24, 24 (2010) ("The containment approach . . . is an accepted, effective way to manage sexual offenders, based on empirical data and theoretical concepts consistent with the best available information from the field of community corrections."); *see also* Kevin Walkow, *Chapter 219:  Chelsea's Law*, 42 MCGEORGE L. REV. 656, 671 (2011) ("The Containment Model is considered the best practice in sex offender management.").  Similarly, a representative of the federal defender community, who testified before the Commission in February 2012, opined that child pornography offenders "can be treated through this containment model."  Testimony of Deirdre von Dornum, Assistant Federal Defender, Federal Defenders of New York, to the Commission, at 388 (on behalf of federal and community defenders) (Feb. 15, 2012).

Although child pornography offenders make up a small percentage of offenders under federal supervision,[69] their supervision requires "extraordinary" resources,[70] and "[p]robably no other offender population offers management challenges in the way that sex offenders do."[71] Success in implementing the containment model thus depends on adequate resources and proper training of the professionals who implement it.[72]

3.                    *Risk Assessments of Child Pornography Offenders*

A threshold issue in approaching individualized treatment and supervision of a sex offender is assessing a particular offender's risk for sexual recidivism.  Because a significant percentage of child pornography offenders either have a history of criminal sexually dangerous behavior[73] and/or are pedophiles,[74] the need to assess their risk of engaging in sexually dangerous behavior is critical.  Mental health experts who treat sex offenders generally agree that an actuarial risk assessment of a sex offender, particularly when used in conjunction with a treatment provider's clinical assessment, is a better means of predicting sexual recidivism than a provider's clinical judgment alone.[75]  An actuarial risk assessment, which uses a validated "instrument" such as the Static-99,[76] "is based on the presence or absence of a limited number of pre-specified factors" associated with recidivism.[77]  However, there is some debate about the

---

[69]  As discussed in Chapters 6 and 9, in fiscal year 2010, non-production child pornography offenders were 2.0% of federal offenders sentenced and production offenders were .025% of all federal offenders sentenced.  *See* Chapter 6 at 126 Chapter 9 at 247.

[70]  Michelle Spidell & Trent Cornish, *Introduction to the Special Issue on Supervision of Sex Offenders and Location Monitoring in the Federal Probation and Pretrial Services System*, 74 FED. PROB. 2, 2 (Sept. 2010).

[71]  CTR. FOR SEX OFFENDER MGMT. (CSOM), ENHANCING THE MANAGEMENT OF ADULT AND JUVENILE SEX OFFENDERS: A HANDBOOK FOR POLICYMAKERS AND PRACTITIONERS 56 (2007) ("CSOM HANDBOOK").

[72]  *See id.* at 9–13.

[73]  *See* Chapter 7 at 181 (approximately one-third of all federal non-production offenders in fiscal year 2010 had histories of criminal sexually dangerous behavior).

[74]  *See* Chapter 4 at 75 (noting that some experts believe that a majority of child pornography offenders are pedophiles).

[75]  *See, e.g.*, Dennis Doren, *Recidivism Risk Assessments:  Making Sense of Controversies*, *in* SEXUAL OFFENDER TREATMENT 3 (W. Marshall et al., eds., 2006).  Several different risk assessments instruments are used by treatment providers.  *See* R. Karl Hanson, *Risk Assessment, ATSA Information Package* (Association for Treatment of Sexual Abusers), 2–4 (2000), http://www.atsa.com/sites/default/files/InfoPack-Risk.pdf (last visited Dec. 20, 2012) (discussing the different instruments); Eric S. Janus & Robert A. Prentky, *Forensic Use of Actuarial Risk Assessment with Sex Offenders:  Accuracy, Admissibility, and Accountability*, 40 AMER. CRIM. L. REV. 1443 (2003) (same).

[76]  *See* Static99 Clearinghouse "Overview," http://www.static99.org (last visited Dec. 20, 2012) (describing the Static-99 risk assessment instrument).

[77]  Douglas Mossman et al., *Risky Business Versus Overt Acts:  What Relevance Do "Actuarial," Probabilistic Risk Assessments Have For Judicial Decisions on Involuntary Psychiatric Hospitalization*, 11 HOU. J. HEALTH & L. POL'Y 365 (2012) ("Over the past two decades, for example, several teams of psychologists have developed 'actuarial risk assessment instruments' . . .  to aid in quantifying the level of risk — that is, the probability — that an evaluee will engage in certain kinds of [illegal] behavior during specified future periods of time.  These instruments get the name 'actuarial' because they implement a judgment process similar to methods used by insurance companies to assess probabilities of certain events (*e.g.*, deaths) and to make decisions about premiums (*e.g.*, for life insurance).  In both cases, an actuarial judgment of risk is based on the presence or absence of a limited number of

predictive value of such assessments for different subgroups of sex offenders, in particular those who have no known history of committing sexual "contact" offenses.[78]  A child pornography offender's risk of committing contact sex offenses generally can be assessed using a validated risk assessment instrument where the offender has a history of committing one or more contact sex offenses.[79]  Social science research on risk assessments applicable to child pornography offenders with no known history of CSDB "is just beginning to emerge."[80]  Currently, there is no validated risk assessment instrument applicable to such offenders — with respect to both future CSDB (in particular, sexual contact offenses) and subsequent non-production child pornography offending.[81]

Emerging research has focused on the "two major dimensions of risk" — sexual deviance and antisociality[82] — for sex offenders generally and child pornography offenders specifically. Such research, which is nascent, has suggested certain specific factors that, particularly in combination, may be relevant to predicting sexual recidivism by child pornography offenders.[83] Because existing research on the predictive value of these factors, whether alone or in

---

pre-specified factors with known, empirically established relationships to an outcome.  Although the scope and implementation styles [of such assessments] vary, they generally direct mental health professionals to gather information about a specific set of 'risk factors' . . . The evaluator then assigns numerical values to these factors according to some preset formula to produce an estimate of risk — a numerical probability . . . .").

[78] *See* Loretta J. Stalans, Robyn Hacker & Mary E. Talbot, *Comparing Nonviolent, Other-Violent & Domestic Batterer Sex Offenders:  Predictive Accuracy of Rish Assessments on Sexual* Recidivism, 37 CRIM. JUST. & BEHAV. 613, 613 (2010); Martin Rettenberger et al*., Prospective Actuarial Risk Assessment:  A Comparison of Five Risk Assessment Instruments in Different Sexual Offender Subtypes*, 54 INT'L J. OF OFFENDER THERAPY & COMP. CRIMINOLOGY 169, 170 (2010).

[79] *See* Angela W. Eke & Michael C. Seto, *Risk Assessment of Child Pornography Offenders*, at 163, INTERNET CHILD PORNOGRAPHY: UNDERSTANDING AND PREVENTING ON-LINE CHILD ABUSE (K. Ribisl & E. Quayle eds., 2012) ("Well-validated risk measures are already available for child pornography suspects who have a known history of contact sexual offending."); Kelly M. Babchishin et al., *The Characteristics of Online Sex Offenders:  A Meta-Analysis*, 23 SEXUAL ABUSE 92, 94 (2011) ("For online offenders who already have a known contact sex offense [history], current risk assessment . . . would be applicable."); *but cf.* United States v. C.R., 792 F. Supp. 2d 343, 459–60 (E.D.N.Y. 2011) (crediting an expert witness who testified that STATIC-99, a risk assessment instrument for offenders who committed "contact" sex offenses, was not appropriately used on an offender who was convicted of a child pornography offense but whose only known "contact" sex offense was proved by a "self-report" by the offender rather than by a prior conviction).

[80]  Eke & Seto, *supra* note 79, at 155; *see also* Jody Osborn et al*., The Use of Actuarial Risk Assessment Measures with UK Internet Child Pornography Offenders*, 2 J. OF AGGRESSION, CONFLICT, & PEACE RES. 16 (2010).

[81]  Eke & Seto, *supra* note 79, at 155; *see also* Abel Testimony, *supra* note 46, at 107 (testifying that risk assessment instruments for child pornography offenders with no contact offense history currently do not exist but may be developed in the future).

[82]  Eke & Seto, *supra* note 79, at 153.

[83]  *Id.* at 156, 160 (noting several such factors:  (1) an offender's general criminal history and, in particular, prior commission of a violent or sexual offense; (2) an offender's prior failure on judicial supervision; (3) an offender's youthful age at the time of his first arrest (for any offense); (4) an offender's history of substance abuse; (5) an offender's low education level; (6) an offender's admitted sexual interest in children; (7) an offender's possession of child pornography depicting prepubescent children; and (8) the prevalence of male victims portrayed in the child pornography possessed by the offender).

combination, is extremely limited, caution should be exercised in using such specific factors to predict CSDB (including the commission of new child pornography offenses), particularly when such factors are considered in isolation.  For instance, the Commission's special coding project of fiscal year 2010 non-production cases found that offenders with a history of criminal sexually dangerous behavior and offenders with no such history had virtually identical prevalence rates of substance abuse, even though this is one of the factors cited as relevant to predicting sexual recidivism.[84]

Some researchers have concluded that the single most significant factor associated with criminal sexually dangerous behavior committed by child pornography offenders (in particular, their commission of sexual contact offenses) is their degree of antisociality, as measured on an antisocial behavior scale.[85]  This recent research concerning child pornography offenders is consistent with earlier research that concluded that antisociality, when coupled with sexual deviance, is a strong predictor of sexual recidivism among sex offenders generally.[86]  Because antisociality is typically manifested during an offender's childhood[87] and further because the typical PSR does not contain extensive information about criminal and other antisocial acts committed by offenders before the age of majority,[88] the Commission's special coding project of child pornography cases was unable to specifically examine antisociality among offenders.

## C.    SEX OFFENDER REGISTRATION AND CIVIL COMMITMENT ISSUES FACING CHILD PORNOGRAPHY OFFENDERS

All offenders convicted of a federal child pornography offense are now subject to sex offender registration laws.  In addition, a small percentage of federal child pornography offenders may face civil commitment after serving their prison sentences.  This section discusses those two post-conviction issues.

---

[84] *See* Chapter 7 at 197 n.93.

[85] *See* Austin F. Lee et al., *Predicting Hands-On Child Sexual Offenses Among Possessors of Internet Child Pornography*, 18 PSYCH., PUB. POL'Y, AND L. 644 (2012).  In their study, the researchers asked offenders various questions related to antisocial behavior, such as an offender's history of committing violent offenses, childhood bullying behavior, and misconduct resulting in expulsion from school.  *See id.*  Assessing antisociality often requires knowledge about an offender's youth (in particular, whether he engaged in antisocial acts before the age of 15 years old).  *See* AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEXT REVISIONS (DSM-IV-TR) 645–650 (4th ed. 2000) (requiring, for a diagnosis of antisocial personality disorder, that "[t]here is evidence of [antisociality] before [the] age [of] 15 years").

[86] *See* R.K. Hanson & K. Morton-Bourgon, *The Characteristics of Persistent Sexual Offenders:  A Meta-Analysis of Recidivism Studies*, 73 J. OF CONSULTING AND CLINICAL PSYCHOL. 1154 (2005) (meta-analysis of 82 different studies involving 29,540 sex offenders from several different countries, including the U.S.; primary findings were that deviant sexual interests and antisocial orientation were primary predictors of sexual recidivism).

[87] *See* DSM-IV-TR, *supra* note 85, at 645–50.

[88] *Cf.* USSG §4A1.2(d) (limiting consideration of offenses committed prior to age 18 for purposes of determining an offender's criminal history category).

# EXHIBIT "F"

**MEMORANDUM**
**TO THE HONORABLE JACK B. WEINSTEIN**
**Senior United States District Judge**

Reference is made to Your Honor's recent inquiry regarding information on the treatment and supervision of offenders convicted of Possession of Child Pornography under supervision in the Eastern District of New York (EDNY). By way of background, the sex offender specific caseload was created in the Eastern District of New York, within the Supervision Division in November 1998, due to the increase of sex offender registration laws and offenders convicted of sexual offenses entering the federal criminal justice system. Prior to the establishment of the sex offender caseload, sex offenders were assigned to a mental health caseload, where the officer supervised offenders with a myriad of mental health disorders. The department created a second sex offender specific caseload in 2001, to address the supervision of sexual offenders on Long Island. Finally, in 2003, the department created the Sex Offender Unit, which currently consists of a Supervisory U.S. Probation Officer, a Senior U.S. Probation Officer, two U.S. Probation Officers (one based in our Brooklyn office and the other working out of the Central Islip Courthouse), and the department's CyberCrime Specialist. The unit is responsible for supervising all registered sexual offenders convicted of a federal and/or military sex offense, as well as those federal offenders who have been convicted of a previous sex offense on the local level and lastly those offenders who have a history or pattern of sexually deviant behavior. It is noted that over the years, our department has utilized the Containment Approach Model to supervise and treat convicted sex offenders. This model, endorsed by the Administrative Office of the Courts, American Probation and Parole Association, and Alliance for the Treatment of Sexual Abusers (ATSA), requires a collaborative approach wherein information is shared amongst supervising officer, treatment provider and polygraph examiner in an effort to establish the most effective treatment and supervision plan.

The Sex Offender Unit is currently supervising 70 sexual offenders, 55 of which are registered sex offenders in New York State. Of these 70 offenders, 36 were convicted of a child pornography offense[1] (this includes possession, receipt, and/or transmission of child pornography images). Out of the 36 child pornography offense convicted currently under supervision, 9 have admitted to prior sexual contact of a minor[2] through the use of clinical polygraph and/or self report (during the term of supervision). We note that 4 out of the 36 child pornography offenders currently on supervision have yet to undergo a sexual history polygraph due to their early stages of treatment, hence the extent of their abuse remains unknown.

---

[1]For the purposes of this memorandum, the probation department has included only those offenders convicted of a child pornography offense. We note that there are those occasions where child pornography is traded or found in connection with an investigation, although the offender was not convicted of a child pornography offense. Those cases were not included in this data.

[2] The probation department utilizes the New York State Penal Law definition of sexual contact. "Sexual contact" means any touching of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing.

The following statistics were obtained from the 36 child pornography offenders we are currently supervising: 5 offenders are between the ages of 60-69 (2 have reported sexual contact with a minor prior to the term of supervision); 8 offenders are between the ages of 50-59 (2 have reported sexual contact with a minor prior to the term of supervision); 9 offenders are between the ages of 40-49 (3 have reported sexual contact with a minor prior to the term of supervision); 9 offenders are between the ages 30-39 (1 has reported sexual contact with a minor prior to the term of supervision); and 5 offenders are between the ages of 20-29 (1 has reported sexual contact with a minor prior to the term of supervision).

The probation department is currently supervising 3 offenders convicted of a child pornography



offense who are under the age of 26. We currently have no females under sex offender specific supervision. It is interesting to note that to date, the department has only knowingly supervised 1 female who was convicted of a sex offense (she was convicted of Possession of Child Pornography and successfully completed her term of release). The remaining 34 sex offenders currently under our supervision have been convicted of a variety of sex offenses including, but not limited to: Coercion and Enticement; Rape; Sexual Abuse of a Minor; Sexual Abuse of a Ward; Traveling Interstate to Engage in Sexual Activity with a Minor; Promoting Prostitution; and Failure to Register as a Sex Offender.

Since 1999, the unit has supervised approximately 280 registered and non-registered sex offenders,



108 of which were convicted of a child pornography offense as previously defined. Approximately 20% of the 108 child pornography offenders supervised by this office disclosed a prior victim (sexual contact with a minor that occurred before the term of supervision which was never reported to law enforcement or another treatment agency) either via clinical polygraph examination or self report during the term of supervision. It is the policy of the probation department and treatment provider to advise offenders that any such disclosure will not be used against them for the pursuit of new criminal charges, so long as they do not provide identifying information. As such, they are encouraged to only report the age, gender, and details of the sexual contact in an effort to gain the offender's trust and provide the basis for continued honesty in treatment. Much to the credit of our supervising officers and treatment providers, we have had only 1 known offender convicted of child pornography offense who committed a new sexual contact offense while under the supervision of this department, which we are aware of. This offender admitted to current sexual contact of a 9 year old female family member during a polygraph examination. The information was subsequently confirmed through investigation by our department and the Suffolk County Police Department. The offender, who was 36 years of age at the time of the new criminal conduct, was prosecuted by local authorities and had his supervision revoked in this district. He is currently serving his second term of supervised release with our district.

Although only 1 known offender convicted of a child pornography offense under our supervision



has committed a new sexual contact offense with a minor, it is imperative to point out that this population has its share of non-compliance. This is evident by the fact that out of the 108 offenders convicted of a child pornography offense, approximately 244 instances of non-compliance or requests for modifications were reported to the Court since 1999. This number is consistent with the probation department's belief in graduated sanctions and the fact that successful sex offender supervision relies heavily on responding to all levels of non-compliance. Furthermore, of the 108 offenders under our supervision convicted of a child pornography offense since 1999, 14 had their supervision revoked (12.9%) and 3 of the offenders had multiple terms of supervision revoked.



**1999-2010 Supervision revocations of offenders with child pornography offenses**

Convicted child pornography offenders with revoked supervision, 12.96%

Convicted child pornography offenders with successful completion or currently active, 87.04%

**\*for these 108 offenders, approximately 244 instances of non-compliance or requests for modifications were reported to the Court since 1999.**

As mentioned above, since the inception of the sex offender specific caseload, the probation department has utilized the Containment Approach in an effort to minimize risk to the community, while providing treatment to the offender. "This approach rests on the dual premise that sex offenders are one hundred percent responsible for the damage they inflict on others and that they must constantly and consistently be held accountable for their inappropriate thoughts, feeling, and illegal actions." (English, Pullen, Jones, & Krauth, 1996). The three central components of the Containment Approach are as follows: 1) Internal Control - control over inappropriate sexual impulses, feelings, and behaviors through offense specific treatment and a variety of psycho-educational and behavior modification techniques; 2) External Control - provided by the criminal justice system through the use or threatened use of sanctions to ensure compliance with the conditions of supervision; 3) Clinical Polygraph Examinations - used as a monitoring tool to combat the offender's reluctance to disclose the information necessary for effective monitoring. The goal of the polygraph exam is not for the offender to fail, but rather pass, meaning proper disclosure was made. (English, Pullen, Jones, & Krauth, 1996) This in turn will increase the likelihood that the appropriate treatment and supervision plan will be developed and implemented. Offenders enrolled in sex offender specific treatment through our department are required to undergo a sexual history polygraph examination no later then 4 months after the commencement of treatment. This examination is followed by maintenance examinations to ensure honesty in treatment and compliance with the conditions of supervision. These examinations are usually given to an offender every 6 months during the term of supervision.

Officers are selected for the unit on a competitive basis. Emphasis is placed on field work, desire and emotional ability to work with this unique population and familiarization with the Containment Approach. The unit receives extensive on the job training conducted by the supervisor and senior officer. Additionally, officers routinely attend training in the field of sex offender treatment and supervision. Over the years officers have attended national training with the Alliance for the Treatment of Sexual Abusers (ATSA), the New York State Alliance for the Treatment of Sexual Abusers (NYATSA), Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Office, as well training with the Administration for Child Services (ACS), Coalition Against Child Abuse and Neglect (CCAN), and the Federal Bureau of Investigation (FBI). Officers are current members of the EDNY Sex Offender Task Force, which provides a forum for inter-agency collaboration. Finally, several officers have been recognized both internally and externally for their work with sex offenders. Specifically, 3 officers have been honored with the distinguished "Champion for Children" award presented by the Parents for

Megan's Law.

In 2009, the probation department solicited vendors for sex offender treatment through the Metro Newspaper and Fedbiz-ops. The only response to New York City solicitation came from New York Forensic. On Long Island, the probation department received responses from both New York Forensic (Great Neck office) and First Light Psychological Services (Farmingdale). As such, contracts were awarded to New York Forensic (both Brooklyn and Long Island) and First Light Psychological Services (Farmingdale).

New York Forensic has been working with the probation department and our sex offender population for the last ten years and currently treats the bulk of our sexual offenders. New York Forensic offers a wide variety of mental health services. Therapists are well equipped to treat mental health issues such as depression and anxiety, while also addressing an offender's deviant sexual behavior. Individual sessions can be increased or dedicated solely to addressing an underlying mental health issue or illness before delving into the criminal sexual behavior. Psychopharmacologic treatment is also available and can be instituted as part of an individual's treatment program.

New York Forensic is currently treating 42 sex offenders under the supervision of the EDNY. It is noted that New York Forensic also treats sexual offenders referred from the Southern District of New York, in addition to local community correctional agencies, such as the New York City Probation Department. Of our 42 offenders, 34 were convicted of a child pornography offense. These offenders are required to attend both weekly group and individual treatment sessions. Currently, there are 5 sex offender specific groups being run by New York Forensic on a weekly basis. According to New York Forensic, their Sex Offender Treatment Program includes individual therapy and psycho-educational groups which stress personal responsibility and focus on increasing self-awareness, developing self-control, facilitating victim empathy and relapse prevention. Consistent with the "containment approach model," New York Forensic believes that it is essential that the treating clinician, referring party, probation officer and the Court remain in regular contact in order to promote optimal client attendance and compliance with treatment. Clinical polygraph is used on an intermittent basis throughout the course of treatment to assist the patient and clinician in formulating and instituting a treatment plan that reflects the reality of each patient's pattern of offending behavior.

Program coordinator, Jennifer McCarthy, Ph.D., advises that there are currently 5 staff members assigned to sex offender specific therapy (2 males therapists and 3 female therapists). 4 out of 5 of these therapists currently have their Ph.D. in Psychology, while the 5th member is in the process of obtaining same. Therapists consistently meet with the program coordinator to discuss specific cases. Both the probation department and program coordinator encourage therapists to attend training and continue their development in the field of sex offender treatment. According to Dr. McCarthy, there is currently no treatment regiment dedicated specifically to the child pornography offender. Thus, this particular type of offender participates in sex offender specific treatment, with emphasis placed on the details of the instant offense and the offender's sexual experiences and background. As such, treatment is individualized to meet the cognitive and emotional needs of the offender. Risk factors are discussed in treatment and relayed to the supervising officer and polygraph examiner in an effort to modify behavior and identify triggers. All offenders entering the program are assessed to ensure they possess the cognitive skills and maturity to participate in a sex offender group.

Dr. McCarthy states that several studies were presented at this year's national ATSA conference on the topic of child pornography offenders and recidivism rates. One such study due to be published by the end of the year, suggest "anywhere between 0% and 50% of child pornography offenders report a history of having sexual contact with minors. Despite this, however, we cannot assume that these offenders will engage in sexual contact with minors in the future as the research in this

area informs that child pornography offenders, as a group, are low-risk, to recidivate with a contact offense." (Eke, Seto, & Williams, in press)  She further advises that some variables have been found to be predictive of contact sexual recidivism.  These include age at first offense (i.e the younger the offender, the higher risk), criminal history, failure of conditional release, lower education, being single, using non-internet child pornography, involvement with minors on-line, and indiscriminate sexual behavior involving adults (possibly indicative of intimacy deficits).

In closing, the probation department believes that successful supervision of a sex offender requires constant interaction between officer, therapist, and polygraph examiner.  It is this collaboration coupled with an offender's willingness to be honest in treatment that leads to rehabilitation and a successful term of supervision.  Over the years we have been able to effectively implement this belief.  The current issue plaguing sex offender treatment and supervision is the lack of "intensive" or "inpatient" therapy available to offenders with significant or recurring sexually deviant thoughts and behaviors.  The probation department continues to try and find programs available to assist this small population, but currently are only aware of the Bureau of Prisons residential sex offender treatment programs.

If Your Honor has any further questions, I am available to discuss sex offender supervision at anytime.


RESPECTFULLY SUBMITTED:

EILEEN KELLY
CHIEF U.S. PROBATION OFFICER



PREPARED BY: _____

Lawrence M. Andres, Jr.
Supervisory U.S. Probation Officer
718-804-2766


cc: The Honorable Raymond J. Dearie, Chief U.S. District Judge
    Eileen Kelly, Chief U.S. Probation Officer




REFERENCES

English, K., Pullen, S., Jones, L., and Krauth, B. (1996). A Model Process: A Containment Approach.  In K. English, S. Pullen and L. Jones (Eds.), Managing Adult Sex Offenders (pp. 2-10, 2-11).  Lexington, KY: American Probation and Parole Association.

Eke, A., Seto, M., Williams, J., (in press).  Assessing the Risk Posed by Child Pornography Offenders.

# EXHIBIT "G"



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:          CPD/PSB
NUMBER:    5324.10
DATE:        February 15, 2013

# Sex Offender Programs

/s/
*Approved*:  Charles E. Samuels, Jr.
Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

To establish procedures and guidelines for Sex Offender Treatment and Management Services in the Bureau of Prisons (Bureau).  This Program Statement is a plain-language, comprehensive set of operational guidelines for sex offender programs operated by psychologists, treatment specialists, and other Bureau staff.

a. **Program Objectives.**  The expected results of this Program Statement are to establish:

- Treatment programs that provide sexual offenders in Bureau institutions the opportunity to change behaviors, thereby reducing criminality and recidivism.
- Specialized correctional management practices to address behavior that indicates increased risk for sexual offenses upon release.
- Evaluation services to appraise risk of sexual offenses upon release and provide recommendations for effective reintegration into the community.
- Transition services for sexual offenders releasing to the community.

SENTRY definitions and assignments are on the Psychology Treatment Programs section of the Psychology Services website on Sallyport.  Treatment forms discussed in this policy are also located on Sallyport (Policy/Forms on the toolbar).

b. **Definitions**

- **Sexual offender**.  Any inmate with a current or prior sexual offense conviction, or a conviction for an offense that involved a sexual element (e.g., convicted of Robbery with offense conduct that includes the rape of the victim).  For the purposes of this Program Statement, criminal violations involving sexual conduct with a consenting adult (e.g., prostitution, pimping) are not sexual offenses.

Supplemental treatment protocols may be used in addition to the Bureau's treatment materials. These program adjuncts must be compatible with CBT, and support the overall goals of the treatment program.  Any supplemental treatment protocols must be approved by the Behavioral Management Programs Coordinator, Psychology Services Branch, in consultation with the Regional Psychology Services Administrator or the Regional Psychology Treatment Programs Coordinator.

3.3  **Program Operations.**  Residential and Non-Residential sex offender treatment programs (SOTP-R and SOTP-NR) share the following operational procedures.

3.3.1  **Screening and Referral Procedures.**

a.  **Program Referrals From Non-SOMP Institutions**.  Psychology Services at all Bureau institutions will ensure that inmates with a history of sexual offenses receive information about sex offender treatment programs.

Inmates may self-refer for sex offender treatment services by submitting an Inmate Request to Staff (BP-A0148) to the Chief Psychologist at the inmate's current institution. Participants may enroll in the sex offender treatment program at any time during the course of their sentence, provided they have sufficient time to complete the program.

To ensure that the maximum number of inmates have the opportunity to benefit from sex offender treatment programs, inmates are prioritized for placement based on their Projected Release Date (PRD).

b.  **Eligibility Criteria.**  Inmates who express a willingness to participate are screened by a psychologist at the inmate's current institution to determine their eligibility for the program. An inmate must meet the following eligibility criteria to be admitted into a sex offender treatment program:

- The inmate must meet to the definition of a sexual offender, as defined in this Program Statement.
- The inmate must have sufficient time remaining on his/her sentence to complete the program, including time to transfer to the SOMP institution and receive placement in community programs, if eligible. In cases where the inmate's release date is based on a parole date, the presumptive parole date will be used to determine his/her eligibility.

  ➢ To complete the SOTP-NR, the inmate must ordinarily have no less than 21 months to his/her projected release date.
  ➢ To complete the SOTP-R, the inmate must ordinarily have no less than 27 months to his/her projected release date.

- Ordinarily, the inmate should have no 100- or 200-level incident reports in the last year. Inmates with three or more 300- and 400-level incident reports may also be precluded from placement in treatment.

➤ Pretreatment programming to build motivation and enhance readiness for the SOTP-R or SOTP-NR.
➤ Psychoeducational or psychotherapy groups that provide skills used in the SOTP-NR or SOTP-R (e.g., communication skills training; basic cognitive skills).
➤ Psychoeducational or psychotherapy groups that address other important treatment needs (e.g., anger management; criminal thinking; drug abuse treatment).

The specific content of adjunctive services, and duration of an inmate's participation in these services, will be based on the clinician's discretion and availability of resources.   Adjunctive programming provided by SOMP staff will be documented on PDS, as directed by the Program Statements **Psychology Services Manual** and **Psychology Treatment Programs**.  Inmates who complete pretreatment services should not receive SOTP-NR or SOTP-R program completion assignments on SENTRY.

## 3.5   Residential Sex Offender Treatment Programs

**3.5.1   Purpose**.  The Residential Sex Offender Treatment Program (SOTP-R) is a high-intensity program designed for high-risk sexual offenders.

**3.5.2   Staffing**.  The SOTP-R is staffed by a psychologist who serves as the Sex Offender Management SOMP Coordinator and a team of SOMP Psychologists and SOMP Treatment Specialists.  A ratio of no more than 14 inmates per treatment staff member will be maintained. Staff performing duties in the SOTP-R will not be assigned a SOTP-NR caseload.

**3.5.3   Duration**.  Ordinarily, SOTP-R entails 10 to 12 hours of programming per week over 12 to 18 months, totaling no less than 400 hours.

**3.5.4   Target Population**.  As a high-intensity treatment program, residential sex offender treatment is targeted to:

■ Inmates who have a high-risk classification for reoffense based on an actuarial risk assessment, using the Static-99R or another risk instrument standardized for use with sexual offenders.
■ Inmates who are judged by SOMP staff or designated staff at the DSCC to be more appropriate for a high-intensity program based on the extent of their sex offense history, criminal history, or other factors associated with increased risk.
■ Inmates who are participating in the moderate-intensity SOTP-NR, but whose risk assessment is adjusted upward by treatment staff due to factors that became apparent while in treatment (e.g., disclosure of previously undocumented sexual offenses).

**3.5.5   Residential Treatment Unit**.  The SOTP-R Unit is to be separated from the general population.  Living together in a unit allows all inmates to work together to create a community that supports pro-social attitudes and behaviors.